BERTHA F. LIVERMORE *vs.* MURIEL L. SEWARD & another.

Norfolk.    January 6, 7, 1942. — April 4, 1942.

Present: FIELD, C.J., QUA, DOLAN, & RONAN, JJ.

*Probate Court,* Jury issues.    *Undue Influence.*

Provisions in the will of an elderly man for his widow, who was his second
wife, and for her children by a former husband, as compared with
the provisions for his own children by a former wife, considered with
statements by counsel of expected evidence of the circumstances in
which such second wife had been divorced from another and had
married the decedent, of her bringing about thereafter an estrange-
ment of him from his children and grandchildren, toward whom he
had manifested great affection, of gifts to such wife of the major
part of his substantial fortune before the will was made, and other
circumstances, showed error in the denial of a motion for a jury trial
of the issue of her undue influence.

A contestant of a will making a statement of expected testimony in sup-
port of a motion for jury issues is not required to disclose the names
of the witnesses upon whom he relies to give such testimony.

PETITION, filed in the Probate Court for the county of
Norfolk on March 17, 1941, for proof of a will.

A motion for jury issues was heard by *Reynolds,* J.

*J. L. Hall,* (*M. E. Foster & J. B. Reigluth* with him,) for
the respondents.

*R. M. Russell,* (*E. C. Mack* with him,) for the petitioner.

DOLAN, J.    This is an appeal from a decree denying the
respondents' motion that issues be framed for jury trial in
the matter of the petition for probate of an instrument
purporting to be the last will of Homer F. Livermore, late
of Brookline, deceased.

The case was heard by the judge upon statements of ex-
pected proof by opposing counsel and certain documentary
evidence.    The sole contention of the respondents is that
the judge erred in not framing for jury trial the third issue,
as follows: "Was the execution of said alleged will of said
Homer F. Livermore, procured by the fraud or undue
influence of Bertha F. Hanson, sometimes called Bertha

F. Livermore, exercised upon the said Homer F. Livermore?"

The decedent died on March 10, 1941, leaving, according to the recitals of the petition for probate, as widow and his only heirs at law, "Bertha F. Livermore . . . Widow" (the petitioner) and Muriel L. Seward and Bessie L. Morgan, his daughters. The decedent's daughters are the respondents.

The instrument offered for probate is dated July 14, 1939. Under its terms the decedent bequeathed to the petitioner, if she survived him, all of his personal effects of every kind. He also bequeathed and devised to her, should she survive him, one half of all the residue of his property and gave the remaining half to his issue living at the time of his death, "per stirpes and not per capita." In the event that the petitioner should predecease him, he gave one quarter of the residue to his issue living at the time of his decease; three sixteenths to Alice Hanson White, the daughter of the petitioner, but to be held in trust, the income to be paid to her during her life, and upon her death the principal to be paid to Joan B. Hanson, also a daughter of the petitioner, if then living and she should have attained the age of thirty years, and if she was then living but should not have attained the age of thirty years, the principal of the trust was to be added to a trust of nine sixteenths of the residue, in accordance with the provisions creating a trust for Joan under the succeeding paragraph of his will. In the event that Joan predeceased Alice Hanson White, the principal of the trust was to be distributed to her issue, and in default of issue to her heirs in accordance with the laws of Massachusetts "then in force and effect."

The provisions of the trust created of nine sixteenths of the residue should the decedent's wife have predeceased him need not be recited in detail. It is sufficient to say that it was created wholly for the benefit of her daughter Joan or, in certain events, for those who would be entitled to her estate under our statute of distribution. These provisions of the instrument relative to the disposition of the decedent's estate in the event that the petitioner prede-

cease him are not effective since she survived him, but are set forth here because relied upon by the respondents as bearing upon the issue of undue influence sought to be framed for jury trial, since in the event that the decedent's wife had predeceased him three fourths of his estate would be enjoyed by his wife's daughters or those entitled to their estates, to the exclusion, as to that share, of the daughters of the deceased and of their issue or heirs. The approximate value of the estate of the decedent is $150,000. The petitioner is the executrix named in the instrument in question.

The daughters of the deceased are married. Mrs. Morgan has no children. Mrs. Seward has two children by her first husband. The first wife of the decedent died in August, 1932. She was the mother of Mrs. Morgan and Mrs. Seward. The decedent married the petitioner, who was then Mrs. Bertha F. Hanson, on February 22, 1934, under circumstances offered to be proved by the respondents, to which we will refer later. The decedent was then about seventy years of age, and was possessed of property of a value not less than $500,000.

Alleged facts offered to be proved by the respondents by the testimony of witnesses may be summarized as follows: The decedent had an agent named Oates Hanson who conducted his business in Allentown, Pennsylvania. The petitioner was the wife of Hanson. She was some twenty years younger than the decedent. When the decedent went to Allentown he was entertained by Mr. and Mrs. Hanson. The latter manifested a great deal of interest in the decedent. Following the death of his wife, the petitioner became attentive to him; made him her confidant. "It had been arranged" that the petitioner should go to Nevada, obtain a divorce from her husband and marry the decedent. Mr. Hanson, however, was not complacent, and in 1933 the petitioner left him and came to live in Boston. Her husband brought suit against the decedent for alienation of affections. "There was a bargain made . . . [he] was bought off . . . with one condition, that he should go to Nevada and get a divorce." He went there, remained

there for six weeks, and obtained a decree of divorce. The petitioner established a residence in an apartment in Cambridge, which was hired by the decedent in the name of Oates Hanson. The decedent furnished the silver, glass and household furniture, which had belonged to his deceased wife, for use in the apartment. When he stated that he was going to live with the petitioner in that apartment the respondents protested, and succeeded in persuading him not to do so. He married the petitioner on February 22, 1934. On June 6, 1934, the decedent made a "will" under the terms of which he gave his personal effects to the petitioner, and placed the residue of his estate in trust, two fifths of the income to be paid to the petitioner, two fifths to his daughters in equal shares, and one fifth for the education of his grandchildren, with provision that ultimately the principal of the trust estate should go to the grandchildren. One of the respondents, the petitioner and a trust company were named trustees under this instrument. Within the following year "there was a complete transformation of . . . [the decedent's] natural feelings to those of his own blood." The petitioner had expressed dissatisfaction with the provisions of this instrument, and complained that she was at least entitled to one third of what the decedent had, and she succeeded in getting "that will changed."

Prior to the marriage of the petitioner to the decedent, his conduct toward the respondents and his grandchildren was of a loving nature. He contributed to their support, and when the respondent Muriel divorced her first husband, the decedent insisted that there be no alimony, saying that he intended to support her and her children. He kept this agreement until estranged from them a year or so after his marriage to the petitioner. In 1931 or 1932 he wrote to Muriel that "No one could love their daughters more than I do you and Bessie and their welfare is and has been an important part of my life." He had been in the habit of having his grandchildren with him for visits, and in the summer of 1934 he invited them to visit him. The petitioner protested, saying that she had "not agreed to take care of

a lot of grandchildren" and "stormed out of the house," and the decedent "had to go and search for her somewhere in Lynn and bring her back." After Christmas day in 1934, he never saw his eldest grandchild again. And after the early part of 1935 he never saw his other grandchild by Mrs. Seward's first marriage again. He had finally told him that he never wanted to hear from him again. The petitioner had said to the decedent: "I am your wife, but every time you open your mouth it is 'grandchildren, grandchildren.'" Early in 1935 the petitioner began to complain to the decedent that his daughters were extravagant, saying, "You better check up on your daughters." Following this incident, the decedent remonstrated with Mrs. Seward about the doctor's bill incurred by her for her two children. The petitioner reported to the decedent that Mrs. Seward had said that he might not live long. This angered him and he refused to believe Mrs. Seward when she said that she had never made such a remark. About this time the decedent made a gift to the petitioner of one hundred shares of the "Livermore Company" of an estimated value of $21,590. Mrs. Seward "sensed" something was wrong and asked if she could not come and see her father but "was told that she could not." On March 8, 1935, the decedent made a new will under which he left the petitioner his "personal belongings" and one half of the residue of his estate, and the remaining one half in equal shares to his daughters, the respondents. On the decedent's birthday, September 16, 1935, the decedent's daughters called upon him. He scolded them, waved his hands and said he never wanted to see them again. "And he never did." They sent him letters which he never opened and the petitioner said, "He never will open them." He "took away" their pictures from his living room and from his office. The gift to the petitioner by the decedent, to which reference has already been made, was followed in the same year by one of sixty-four shares of "Guaranteed Parts," a subsidiary of the Livermore Company. This was valued at $4,238. Between December 21, 1935, and January 23, 1936, $117,000 in securities, cash and life insurance was given by the

decedent to the petitioner. In April and May of that year he made cash transfers to her of $5,500. In June, 1936, a quarrel occurred between them. The petitioner locked the decedent out on a second story porch and would not "let him in" for some time. Finally "after every one had seen what was going on" he "was allowed in." About that time he transferred to the petitioner "something in the neighborhood of $5,000." Later there was a transfer by him to her of $25,000 in cash, and still later "there were three separate transfers of $19,000." In October, 1937, there was a transfer of "over" $4,000. In that same year there was "more trouble" and the decedent said, "I can't go on," and the petitioner was heard to say "that she would get on her knees and pray to God that Livermore would leave her." In a letter written by the petitioner's oldest daughter, the latter stated: "There is nothing but trouble all the time. The filthy money does not mean a darned thing without happiness. Mr. Livermore is just an old fool and I can't bear it. I am not allowed to speak to anyone unless there is money."

In 1938 the petitioner became vice-president and assistant treasurer of the Livermore Company. She went to the office daily, "discharged employees and got control finally of the business itself." At about this time the decedent had had a slight shock. On September 7, 1938, he gave the petitioner six hundred fifty-three shares of the Livermore Company stock "amounting to" $72,750; on January 5, 1939, six hundred fifty-four additional shares with a value of $65,494; and the same day two hundred twenty-four shares of Guaranteed Parts at a value of $11,546. On April 1, 1940, he transferred to her three hundred sixty-six shares of the Livermore Company of the value of $37,687. She thus held two thousand one hundred sixty-three (out of a total of five thousand) shares of the Livermore Company. The decedent's daughters did not know that he was "putting out of his possession $400,000 in round numbers."

The statement made by the petitioner's counsel is made up quite largely of expected testimony by named witnesses tending to show that the decedent was a self made man and

that he had built a successful business prior to 1929; that in that year he suffered reverses, but recovered from them in later years; that his mind was keen and active to the time of his death, a man of strong will and business acumen. It is unnecessary to recite in detail the statements of expected testimony of the petitioner as to this subject matter. The respondents have not offered to show that the decedent was not of sound mind when he executed the instrument in question. Other statements made in behalf of the petitioner are concerned with expected testimony tending to refute the statement of the decedent's relations with the petitioner. These, however, but put that question in issue. Other statements of the petitioner's counsel concern the execution of the several purported wills by the decedent. They admit the execution of the wills, the one of June 6, 1934, that of March 8, 1935, and of a codicil on March 25, 1936, confirming the prior instrument, but offer to show that the instrument of June 6, 1934, contained a provision not referred to by the respondents, to the effect that if the income provided therein for the petitioner was insufficient for her support and comfort the trustees were to use "any part or all of the principal for her comfortable support."

In connection with the statements of the respondents with reference to the relations between the decedent and the petitioner, the petitioner, in denying that they were as offered to be proved by the respondents, objected that the respondents had not named any witnesses to the alleged unhappy relations between the decedent and the petitioner. This, of course, the respondents were not called upon to do unless required by the judge so to do. *Simoneau* v. *O'Brien, ante*, 68. With reference to the offer of the respondents concerning the changed attitude of the decedent toward his daughters and grandchildren shortly after the marriage to the petitioner and continuing until his death, the petitioner's counsel, in effect, conceded that in 1931 the decedent made gifts to his daughters of more than $4,300; in 1932, $863.25; in 1933, more than $1,400; in 1934, $447.99; in 1935, $845.82; and in 1936 and 1937, lesser amounts. Other payments to his daughter Mrs. Morgan, in the years

1929, 1930, 1931, 1932, 1933, and 1934 totalled $3,975. The petitioner made no offer of expected evidence of any gifts to them by the decedent after 1937. With relation to the gifts stated by the respondents to have been made by the decedent to the petitioner in the years 1935 to April 1, 1940, inclusive, the petitioner's counsel conceded that such gifts had been made of a total value of about $350,000 out of the decedent's property of the value of $500,000; but offered to show that they were made for the purpose of income tax deductions.

The petitioner's counsel read into the record a written statement of the decedent in the following terms: "To whom it may concern: I wish to be clearly understood, my feeling, whatever may occur after my death, is, that I have given liberally to both of my daughters before and after they were married I have been over indulgent in my supply of funds, consequently they have participated in my estate, before my death. Since I stopped supplying funds, over three years ago, while my daughters live within a short distance of my home, they and the grandchildren have never shown any interest in me, in any way. Brookline, Mass. Dated, December 15, 1934. [1938]    /s/ Homer F. Livermore   Witness /s/ W. David Schofield   The above statements are true facts. James W. Foster. My commission expires May 1942   [Seal]." The witness Schofield had been an employee of the decedent, and had been treasurer of the Livermore Company and in charge of its financial aspects for many years. The petitioner's counsel stated that it was at Schofield's "solicitation to some extent, at any rate, or suggestion, that the document was executed" when the decedent had said to him that he felt his "attitude towards those girls may be misunderstood after I am gone, and one of the reasons I am telling you this is because I rely on you and others here to see that that attitude is not mistaken and that it is understood after I am gone." The petitioner offered to show that this statement was preceded by complaints of the decedent to Schofield of the attitude of his daughters, "that their only interest in him was what they could get out of him — his money."

With respect to the preparation and execution of the instrument offered for probate, the petitioner's counsel stated, in substance, that he drafted that instrument and sent it to the decedent together with a letter under date of July 13, 1939 (the day before its execution), in which he said: "I am handing you herewith your Will, redrawn I think in accordance with your wishes and Mrs. Livermore's Will, also redrawn I think in accordance with her wishes." He also returned therewith the testamentary instrument executed by the decedent on March 8, 1935, and that executed by the petitioner dated March 22, 1935. The petitioner made no offer of proof as to when, where or in whose presence the instructions of the decedent were given to the scrivener for the preparation of the instrument offered for probate. So far as appears it was executed by the decedent on July 14, 1939, but not under the supervision of any attorney. It was executed in a room in his home and the petitioner was present when it was executed. One of the attesting witnesses was the Schofield hereinbefore referred to.

In all the circumstances disclosed by the offers of expected testimony, and giving due weight to the decision of the trial judge, we are of opinion that it cannot rightly be said that the opposition to the probate of the instrument presented for probate is unfounded in law and rests on the disappointment or anger of the respondents in the hope that by threatening trouble or expense to the estate they may induce the petitioner to buy a settlement, or that there is not evidence of facts that present a real question as to the issue of undue influence proper for judicial inquiry and trial before a jury. See *Fuller* v. *Sylvia*, 240 Mass. 49.

The respondents were bound to the decedent by the closest tie of blood. They are his children. The petitioner does not controvert in her statement of expected evidence that prior to her marriage to the decedent and for a year or so thereafter he held them and his grandchildren in loving regard. After the death of his first wife he went to live with his daughter Mrs. Morgan. That he held his children and grandchildren in loving regard is evidenced by the terms of the instrument executed by him, shortly

after his marriage to the petitioner, on June 6, 1934. It is not controverted by the petitioner that at that time the property owned by the decedent was at least of the value of $500,000, and was then intact. This instrument, as well as that of March 8, 1935, preceded the gifts made to the petitioner by the decedent, which have been already described. It is manifest that the substance which his children were to enjoy under the instruments of 1934 and 1935 was greatly diminished by these gifts. The form of the instrument of 1935 remained the same, but the substance to which it applied was diminished ultimately and before the execution of the alleged last will by over two thirds.

The statement of expected evidence in behalf of the respondents, if produced and believed by a jury, would warrant them in finding that within a few months of her marriage to the decedent the petitioner was hostile to the respondents and to the decedent's grandchildren, with the result that by 1937 they no longer were received by him (see *Dresser* v. *Dresser*, 181 Mass. 93, 96), that the marriage relations between the petitioner and the decedent were not peaceful, and, while required so far as the record discloses to find that the decedent had testamentary capacity when he executed the instrument in question, a jury could infer from all the circumstances offered to be proved by the respondents that the decedent valued peace. The explanation of the decedent's change of attitude toward the respondents offered to be proved in behalf of the petitioner concedes the change. It is supported by the written statement of the decedent relating to his attitude toward his children, hereinbefore set forth. While this instrument as set forth in the record is "Dated December 15, 1934 [1938]" it seems to be agreed that it was made on December 15, 1938. A jury could consider the circumstances under which this statement was made by the decedent, which have already been set forth, and find that it was made at the suggestion of Schofield, the treasurer of the Livermore Company, at a time when the petitioner owned two thousand, one hundred sixty-three of the five thousand

shares of that company; they could find that it was made by the decedent at a time not long before the execution of the instrument offered for probate, in which no such recitals were made, and could give it as much or as little weight as they chose, and draw such inferences from it as it was susceptible of, among them that the decedent was conscious that his testamentary intentions or provisions coupled with other existing conditions might give rise to a question concerning his real attitude toward the respondents. See *Hoffman* v. *Hoffman*, 192 Mass. 416.

The circumstances under which the instrument now in question was prepared and executed cannot be said rightly not to require careful inquiry with all the other conditions offered to be proved as bearing on the issue of undue influence since it is admitted to have been executed in the presence of the petitioner. The jury could also consider and draw inferences from the provisions of the instrument which concerned the disposition of the estate of the decedent in the event that the petitioner predeceased him. Although the property of the decedent had already been reduced by over two thirds by the gifts to the petitioner (see *Lewis* v. *Mason*, 109 Mass. 169, 176), yet under the terms of the instrument, in the event that has just been referred to, three fourths of the estate was to go as hereinbefore set forth to two daughters of the petitioner, or those entitled to their respective estates. Whether this was freely provided for by the decedent or under the domination and undue influence of the petitioner, weighed with other expected evidence, we think presents a question proper for determination by a jury.

The principles of law relating to what conduct constitutes undue influence have been set forth in many prior decisions of this court. That subject matter is fully discussed in *Neill* v. *Brackett*, 234 Mass. 367. It would serve no useful purpose to recite in detail all that is said there. It is settled that mere opportunity is not enough, but that undue influence may be caused by importunity or arise from unrelaxing efforts in the establishment or maintenance of conditions intolerable to the particular individual, or from

more subtle conduct designed to create an irresistible ascendency by imperceptible means. Its nature is such that it often works in veiled and secret ways. It may be inferred from disproportionate gifts or benefactions to strangers of the blood. *Neill* v. *Brackett*, 234 Mass. 367, 369.

In the present case the respondents' statement of expected evidence tends to show more than opportunity, more than mere suspicion, surmise or conjecture. If produced and believed, the expected evidence of the respondents would warrant the jury in finding importunity on the part of the petitioner in connection with the execution of testamentary instruments by the decedent, an early dislike of his grandchildren, resentment of their visits to him and that they ceased as a result, hostility on her part toward his daughters, statements made by her to him tending to anger him against them, and resultant breach of relations by him with them, conduct in her relations with him tending to create an intolerable situation, gradual acquisition by her of the major part of his property by gifts from him, in one instance at least following a quarrel, and they could find that under the terms of the instrument in question, in certain events (that as it happens will not occur) disproportionate bequests were provided by him for strangers to his blood, the daughters of the petitioner. See *Old Colony Trust Co.* v. *Di Cola*, 233 Mass. 119. It is true that the respondents did not controvert the statements of expected evidence made in behalf of the petitioner tending to show that the decedent was possessed of testamentary capacity at the time of the execution of the alleged will and that down to that time and even thereafter he was of keen and active mind. Those are considerations of great weight in determining the decedent's susceptibility to undue influence. They are not conclusive, however (*Hoffman* v. *Hoffman*, 192 Mass. 416), though they do serve to a certain extent to make the case somewhat close. But the statements of expected evidence made in behalf of the respondents cannot be said rightly to be vague or deficient in particularity, and upon the whole picture portrayed by the statements of the parties we are

of opinion an issue, that of undue influence on the part of the petitioner, is presented proper for judicial inquiry before a jury.

The decree denying the motion for jury issues is reversed, and instead an order is to be made framing the third issue set forth in the motion for jury trial.

*Ordered accordingly.*