IN THE MATTER OF THE ESTATE OF LAWRENCE MORETTI.

No. 06-P-1722.

Suffolk. March 7, 2007. - August 1, 2007.

Present: BERRY, SMITH, & DOERFER, JJ.

*Will,* Undue influence. *Fiduciary. Undue Influence. Practice, Civil,* Presumptions and burden of proof.

Discussion of the standard of review applicable to a will contest. [650-651]

In a will contest, the judge properly shifted the burden of proof to a fiduciary to establish that his activities in relation to the drafting of a new will for the person for whom he was a fiduciary, which new will named the fiduciary as principal beneficiary, did not violate his obligations, where the fiduciary not only controlled the finances of the elderly and dependent individual, but also served as the sole gatekeeper for him, by answering all telephone calls, opening all mail, and screening all visitors [651-653]; further, the fiduciary failed to satisfy that burden by demonstrating that the individual truly had the advice of independent legal counsel in formulating his estate plan and in drafting and executing his will, given the nature and extent of the fiduciary's involvement in the communications, correspondence, and work products of the attorneys [653-654].

The fiduciary in a will contest failed to meet his burden of proving the absence of undue influence, where there was an unnatural disposition made by a person susceptible to undue influence to the advantage of the fiduciary, who had an opportunity to exercise undue influence and who, in fact, used that opportunity to procure a changed will through improper means. [654-659]

PETITION for conservatorship filed in the Suffolk Division of the Probate and Family Court Department on March 20, 1991.

Petitions for probate of a will, each filed on July 9, 1993, were heard by *Nancy M. Gould, J.*

*Donna M. Evans* (*Breton T. Leone-Quick* with her) for Romano Pagliarani.

*Robert J. O'Regan* (*Diane A.D. Noel* with him) for Rita Casoni.

*Jay W. Pearlman,* of New York, for Teresa Antonelli, was present but did not argue.

BERRY, J. This appeal involves application of the rule set forth in *Cleary* v. *Cleary*, 427 Mass. 286 (1998), and *Rempelakis* v. *Russell*, 65 Mass. App. Ct. 557 (2006), which shifts the burden to a fiduciary to prove the absence of undue influence in a challenge to a will naming the fiduciary as beneficiary. "[T]he fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations." *Cleary* v. *Cleary*, *supra* at 295. This special burden-shifting rule is an exception to the general rule that in a will contest based on allegations of undue influence, the burden of proof ordinarily rests with the party contesting the will. See *Tarricone* v. *Cummings*, 340 Mass. 758, 762 (1960).

The contention of the defendant in this appeal is that the *Cleary-Rempelakis* burden-shifting rule only applies in the "extraordinary" situation of a fiduciary who participated directly in the actual drafting and execution of the will and related documents of inheritance under which the fiduciary benefited. This is an overly limited reading of the *Cleary-Rempelakis* rule, which applies not just to the drafter of estate planning documents, but to a fiduciary utilizing his position of trust to procure a favorable estate disposition through improper means and self-dealing. Burden shifting under the *Cleary-Rempelakis* rule thus encompasses a will contest involving one who serves as a fiduciary under a power of attorney; was fully involved in all the undertakings relative to the revisions of the testator's will and estate plan, yielding the beneficial inheritance; and exercised unrestricted and expansive power over the testator's finances — a power, in this case, enhanced by the defendant acting as a gatekeeper, isolating the testator from longstanding close friends, and barring access by others.

Also at issue in the appeal are questions involving the engagement of legal counsel. On this point, the defendant asserts that, even if the *Cleary-Rempelakis* burden-shifting rule applies in determining undue influence, the representation of several lawyers who worked on the testator's estate plan lifted the defendant over his shifted burden and proved the absence of undue influence in the preparation of the will. But, to have effect on the shifted *Cleary-Rempelakis* burden, the intervention

of legal counsel and measured independence must be real, not illusory; the legal representation provided must be truly independent, with the lawyer's loyalty flowing to the client testator alone.

Here, the defendant was an intruder into the relationship between the attorneys and the testator, and engaged in acts which, in effect, subverted the independence of the legal representation. For example, the defendant controlled the engagement of the attorneys, orchestrated the firing of one attorney who raised objections to the defendant's involvement in the client's estate planning, and was the moving force in hiring one successor attorney who had represented the defendant himself. Furthermore, the defendant monitored all lawyers' correspondence to the testator, reviewed will drafts, and made written comments thereon. Viewed in totality, the defendant's intrusive actions were such that the testator was not rendered real, rather than illusory, independent legal representation, and the heightened scrutiny of the bequests made to the defendant under the will did not, as the probate judge found, satisfy the *Cleary-Rempelakis* burden-shifting rule. Accordingly, we affirm the judgment dismissing the petition for probate of the subject will on the grounds that said will was procured by the exercise of undue influence.

1. *Procedural and factual background.* Romano Pagliarani appeals from the dismissal of a petition for probate of a will of Lawrence Moretti, dated December 3, 1991 (the 1991 will), in which Pagliarani was named the beneficiary of Moretti's principal asset, a six-unit apartment building. A judge of the Probate and Family Court determined that the document was the product of undue influence and ordered that a petition for probate of Moretti's will dated February 8, 1989 (the 1989 will), be admitted to probate. That earlier will left Moretti's building to Rita Casoni, with a life estate to Teresa Antonelli. Pagliarani challenges the judgment of dismissal, asserting error in the judge's ruling that Pagliarani bore the burden of proof at trial on the issue of undue influence. Pagliarani also challenges the judge's findings of fact regarding the independence of Moretti's legal counsel and the nature of the relationship between Moretti and Pagliarani that led to the bequest in Pagliarani's favor.

The will contest was tried over sixteen days, after which the judge issued detailed findings of fact and conclusions of law in

a fifty-page memorandum of decision. We summarize the facts from the judge's findings, which we supplement somewhat, here and in our discussion, from the record on appeal.

Lawrence Moretti, the testator, died on June 16, 1993, at the age of eighty-two. He never married and left no close relatives. His estate included a six-unit apartment building, located at 12 North Bennet Street in the North End section of Boston. After Moretti's death, two petitions were filed in connection with his estate, one to probate the 1989 will, and the other, the 1991 will.

Moretti had owned the building with his two siblings, a brother, John, and a sister, Mary, both of whom predeceased him. Casoni met the Moretti siblings when she first came to the Boston area from Parma, Italy, in 1952, and the Casoni and Moretti families became very close. In 1977, Casoni and her husband moved into a unit in the Morettis' building, and Casoni, as well as her children and grandchildren, were regular visitors to the Moretti apartment. When John Moretti, and then Mary, became ill, Casoni cared for them until their deaths, in 1987 and 1988, respectively, at which point she assisted in their funeral arrangements and hosted receptions for the Moretti family and their friends.

By the time Moretti lost his siblings in the late 1980's, he was suffering from crippling arthritis and other ailments. When he became unable to leave his apartment, Casoni took the lead in ensuring his care. This included visiting Moretti every morning, and often again later in the day, and arranging for Antonelli to provide additional home care. Throughout this period, Moretti was assisted in his financial affairs by Mary Bergazzi, a nun and a family friend of some thirty years, to whom Moretti had granted a power of attorney.[1] Moretti also used the legal services of Thomas Schiavoni, an attorney he had met in 1985 at a neighborhood peace garden. Schiavoni performed legal work for Moretti in connection with the estates of Moretti's siblings and with rent and tenant matters in connection with the building. He also drafted the 1989 will for Moretti, which Moretti executed on February 8, 1989, and which provided, among other things, for

---

[1]This was a service Bergazzi, as a member of her religious order, provided to a number of elderly residents in the area.

the building to be left to Casoni, with a life estate to Antonelli. During this time period, Schiavoni also visited Moretti socially, stopping by Moretti's apartment with his daughter every month or so after church on Sundays. Another close friend of Moretti, Rena Bucchino, who lived around the corner from Moretti's building, had been a weekly visitor to Moretti for more than twenty years. By all accounts, up until November, 1990, Moretti enjoyed warm relationships with the members of this trusted circle, conversing comfortably with them and joking with them during their visits.

In the summer of 1990, Casoni traveled to Italy for a month-long visit with her elderly parents. In her absence, Moretti's health deteriorated dramatically, partly the result of an acquaintance who moved into his apartment and provided him with large amounts of alcohol. Upon Casoni's return, Moretti was hospitalized, and Casoni and Schiavoni arranged for the removal of the problematic houseguest. Moretti now required full-time care, but was adamant in his wish to remain in his apartment and not enter a nursing home. Casoni and Schiavoni arranged for in-home care through a nursing service, but concern for its high cost prompted them to explore other options that would allow Moretti to remain in his home without exhausting his finances.

Casoni had become acquainted with Pagliarani though her employment as a social worker at the North End Community Health Center. She had provided counseling to Pagliarani in 1989, when he came to the center seeking help for depression. Though formal counseling ended that same year, Casoni and Pagliarani had remained in contact, and Casoni knew that Pagliarani was having financial difficulties and was unhappy with his living arrangement. In late October, 1990, Casoni and Schiavoni arranged for Pagliarani to provide overnight care to Moretti. After a time, as both Moretti and Pagliarani seemed pleased with the arrangement, Schiavoni drew up a written agreement, setting out Pagliarani's duties and salary, which Moretti and Pagliarani signed on November 18, 1990. Pursuant to that agreement, Pagliarani was permitted to live with Moretti rent-free and received a weekly stipend of $125, in exchange for providing personal care to Moretti in the overnight hours. In December, 1990, Pagliarani began providing around-the-clock

care, and his salary was increased to $150 a week, though these changes were not put in writing.

Casoni continued to visit Moretti every morning after Pagliarani moved in, but by December, 1990, she began to notice Moretti becoming withdrawn and quiet. Pagliarani often remained in Moretti's bedroom during Casoni's visits. On one visit in early January, 1991, when Casoni turned down the volume of the television in Moretti's bedroom to permit her to converse with Moretti, Pagliarani turned the volume back up, thereby preventing the conversation from continuing. At a subsequent visit, Moretti asked Casoni not to come anymore, and said he could not tell her the reason.

Other regular visitors to Moretti, longtime friends who had known Moretti for many years, noticed similar changes in Moretti's behavior and were similarly discouraged from visiting after Pagliarani moved in. Early on, Pagliarani typically remained in Moretti's room during those visits and did most of the talking. But by February, 1991, Pagliarani denied entrance to most of Moretti's friends altogether.

Like Casoni, Bucchino attempted to continue her regular visits to Moretti but was increasingly thwarted by Pagliarani. When she telephoned ahead, Pagliarani claimed that Moretti was sleeping. When she stopped by in person, Pagliarani refused to allow her to enter. After December, 1990, Bucchino was unsuccessful in her efforts to visit Moretti.

In early January, 1991, Moretti informed Schiavoni and Bergazzi that he was thinking of terminating their services as his attorney and power of attorney, respectively. In a subsequent meeting, Pagliarani himself shouted at Schiavoni that Moretti no longer wanted him as his attorney. Bergazzi attempted to visit Moretti at one point in January, 1991, and reported to Schiavoni and to Donna Casoni, Casoni's daughter-in-law, that Pagliarani had put his hands on her and physically removed her from the apartment.

On January 19, 1991, Donna Casoni and her husband, Joseph, visited Moretti, asking Pagliarani to leave the room so that they could ask Moretti in private about the incident with Bergazzi. Moretti did not respond, pulling his bed sheets up over his chin and looking apprehensively around the room. Pagliarani came

back into Moretti's room and shouted at the couple to leave. Pagliarani thereupon called the police, and the Casonis left the apartment to avoid further trouble.[2]

In early January, 1991, Pagliarani called the law office of an attorney who had represented Moretti prior to Schiavoni, seeking information about a power of attorney. Two attorneys from that office, Martin Alperin and Roderick Ott, subsequently provided legal services to Moretti. On January 14, 1991, Alperin visited Moretti's apartment for Moretti's execution of a new power of attorney in favor of Pagliarani, and revocation of Bergazzi's power of attorney. Remarkably, Pagliarani acted as translator between Alperin and Moretti during this meeting, even though Moretti was born in the United States and spoke fluent English. Soon after, Ott and Pagliarani visited Moretti's bank, where Pagliarani learned about Moretti's bank accounts. Ott also instructed Pagliarani to keep a ledger documenting amounts he spent from Moretti's funds. The judge found, and the record amply confirmed, that upon gaining the power of attorney, Pagliarani started using Moretti's money for Pagliarani's own personal expenses, as if the funds were his own, a practice that increased as time went on, and continued even after Moretti's death.

On January 22, 1991, Ott met with Moretti at Moretti's apartment and discussed changing Moretti's will to leave the building to Pagliarani.

On March 20, 1991, Schiavoni, concerned for Moretti's well-being, filed a petition for conservatorship of Moretti. Attorney Ira Nagel was appointed guardian ad litem for Moretti. Nagel

---

[2]Of the few friends still allowed to see Moretti after January, 1991, Lawrence Lamoretti, who was Moretti's godchild and a cousin of Casoni's late husband, testified that he was permitted to visit Moretti until shortly before Moretti's death, but that he noticed his friend was less talkative and less responsive after Pagliarani moved in, and that Pagliarani was always present in the room during Lamoretti's visits.

Pagliarani introduced the testimony of two other witnesses, Hugh Eller (a priest) and Frank Richard, who testified, through prior recorded testimony, that they were permitted to visit Moretti's apartment and that Moretti expressed his appreciation for Pagliarani's care. Richard was an acquaintance of Moretti's from the North End Veterans of Foreign Wars Post. It appears from the record that Eller was an acquaintance of Pagliarani's, and met Moretti through Pagliarani after January, 1991.

interviewed Moretti, Pagliarani, Schiavoni, and numerous others connected with Moretti, past and present, and on May 22, 1991, reported to the court that Moretti did not qualify for protection under the conservatorship statute, G. L. c. 201, § 1, because he was competent to handle his own affairs. Nagel was concerned, nevertheless, with Moretti's isolation and with his complete dependence on Pagliarani, and Nagel recommended that Pagliarani "never serve alone" as Moretti's conservator. At the trial of this action, Nagel testified that, despite his finding that Moretti was competent, Pagliarani's conduct "set off alarm bells" that Moretti might be susceptible to undue influence. He pointed again to Moretti's isolation from his long-time friends, and to indications that Pagliarani had provided inaccurate information to Moretti about Schiavoni and Bergazzi. Nagel was also concerned about the inconsistencies in the financial ledger kept by Pagliarani.

While the conservatorship proceedings were ongoing, Ott consulted Nagel regarding Moretti's wish to execute a new will, leaving his apartment building to Pagliarani. Nagel cautioned against any lifetime transfer, and warned that any bequest to Pagliarani should be contingent on Pagliarani's continued care of Moretti. Ott met with Moretti at least four times at Moretti's apartment, and prepared various draft wills, which he sent to Moretti by mail. The judge found that Pagliarani opened all mail for Moretti, including the draft wills sent from Ott, and that Pagliarani reviewed the draft wills with Moretti, even writing comments on one draft. As time went on, Ott's correspondence to Moretti reflected a growing concern that Pagliarani was too involved in the will-drafting process. Ott was fired on July 29, 1991.

Meanwhile, Pagliarani had contacted another attorney, Katherine Triantafillou. Pagliarani went to meet with Triantafillou at her law office in early July, 1991. As a result, Triantafillou undertook representation of Moretti in the conservatorship proceedings, and then began working on Moretti's will. In the fall of 1991, Moretti asked Triantafillou to represent Pagliarani in his divorce, and by November, 1991, she was also representing Pagliarani in his dispute with the Department of Welfare, which arose from his failure to report his income from Moretti.

Triantafillou testified that she received an opinion from the ethics committee of the Massachusetts Bar Association that her dual representation was permissible, with disclosure and client consent.

In December, Moretti executed the 1991 will, which left the apartment building to Pagliarani. After the 1991 will was executed, Pagliarani's personal use of Moretti's money continued to escalate, extending to such indulgences as Pagliarani's gym memberships, hair coloring and manicures, restaurants and liquor, clothing and tailoring, and, in the month of May, 1993, $770 on shoes.

In the spring of 1993, Moretti fell while unattended, and Antonelli responded to the emergency call. Antonelli testified that while she was assisting Moretti, Moretti asked her why no one visited him anymore. He told her that Pagliarani threatened to take him to a nursing home if he did not do what Pagliarani said, and that Pagliarani made him sign things that he did not always understand. Moretti died that June.

The judge found that Pagliarani exercised undue influence over Moretti by isolating him and manipulating him into executing the January 14, 1991, power of attorney and the 1991 will in Pagliarani's favor. Accordingly, the judge disallowed the 1991 will as the product of undue influence by Pagliarani over Moretti, and she admitted the 1989 will to probate. Pagliarani appeals from the dismissal of the petition to probate the 1991 will. The issues raised on appeal depend to a large extent on the judge's findings of fact regarding Pagliarani's relationship with Moretti.

2. *Standard of review.* "It is our obligation to review the evidence and reach a decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong, and finding for ourselves any additional facts we believe to be justified by the evidence." *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. 218, 223 (1986), quoting from *Olsson* v. *Waite*, 373 Mass. 517, 520 (1977). The case of *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 190-191 (1999), sets the framework for such appellate review: "[W]e do not set aside a judge's findings of fact unless they are 'plainly wrong' (the standard applicable to probate

proceedings to allow or set aside a will), see *Erb* v. *Lee*, 13 Mass. App. Ct. 120, 124 (1982); *Heinrich* v. *Silvernail*, [*supra*], or 'clearly erroneous' (the standard applicable to equitable proceedings), see Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974)." "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). In applying this standard, "the judge's assessment of the quality of the testimony is entitled to our considerable respect because 'it is the trial judge who, by virtue of his firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence.' " *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 203 (1986), quoting from *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

3. *Shifting of the burden of proof.* In a will contest involving allegations of undue influence, the burden of proof ordinarily rests with the party contesting the will. See *Tarricone* v. *Cummings*, 340 Mass. at 762. But in *Cleary* v. *Cleary*, 427 Mass. at 295, the Supreme Judicial Court established the rule that "the fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations." More recently, in *Rempelakis* v. *Russell*, 65 Mass. App. Ct. at 563, this court further explained that the burden of proof shifted to the fiduciary "only where he has actually taken part in the questioned transaction."

Pagliarani begins by urging a very narrow reading of the burden shifting required by *Rempelakis* v. *Russell*, *supra*, so that it applies only to the "extraordinary" situation of a fiduciary who participated directly in the actual drafting or execution of the will from which he benefited. Had we so intended to limit the scope of *Rempelakis*, we easily could have said so.

The analysis called for in *Rempelakis* v. *Russell*, *supra*, however, requires a broader consideration of the role the fiduciary played in the transaction from which he or she ultimately benefited. Critical to that inquiry is the fiduciary's involvement in the decision-making process regarding the disposition of the

decedent's estate. See *id.* at 567. In *Rempelakis* the judge found that the fiduciary in that case, though locating an attorney to assist the decedent with her will and being present at its execution, "did nothing to influence the decedent's decision or to prepare the implementing documents." *Id.* at 564.

Here, by contrast, the evidence supported the judge's findings that Pagliarani influenced Moretti's decisions regarding his property. Pagliarani gained control over Moretti's physical environment and over Moretti's bank accounts within three months of entering his life. We note from the record that Pagliarani proceeded to take control of Moretti's physical environment and finances in a manner that not only benefited Pagliarani, but was in sharp contrast to how Moretti previously had conducted his affairs — barring access of longtime friends to Moretti's apartment, terminating the assistance of Schiavoni and Bergazzi, and squandering Moretti's money on nonessentials that were purely for Pagliarani's own benefit. And after gaining control over Moretti, Pagliarani began to take an active role in decisions regarding Moretti's will itself, as the evidence showed. Along with his control as power of attorney over Moretti's finances, Pagliarani injected himself into the preparation of Moretti's will by writing on the draft will prepared by Ott, corresponding with attorneys regarding the will, and meeting alone with Triantafillou to discuss issues relating to Moretti's will and other personal and financial matters.

All told, we think it only reasonable that where a fiduciary not only controls the finances, but also serves as the sole gatekeeper for an elderly and dependent individual, by answering all telephone calls, opening all mail, and screening all visitors, that fiduciary should be subject to heightened scrutiny when his services extend to activities involving the preparation of a will naming him as its principal beneficiary. See, e.g., *Neill* v. *Brackett*, 234 Mass. 367, 369 (1920) ("When the donor is enfeebled by age or disease, although not reaching to unsoundness of mind, and the relation between the parties is fiduciary or intimate, the transaction ordinarily is subject to careful scrutiny").

Moreover, shifting the burden to Pagliarani in this instance comported with the rationale for shifting the burden to the

fiduciary who is involved in and benefits from the questioned transaction. "The fiduciary can take precautions to ensure that proof exists that the transaction was fair and that his principal was fully informed, and he is in the best position after the transaction to explain and justify it." *Cleary* v. *Cleary*, 427 Mass. at 293. In accordance with that policy, the combination of Pagliarani's physical control over Moretti and Moretti's access to people and information, Pagliarani's financial control over Moretti's bank account and property, and Pagliarani's direct involvement in the drafting of the will provided ample justification for shifting the burden of proof to Pagliarani.

4. *The issue of independent counsel.* Pagliarani maintains that even if he bore the burden of proof on the issue of undue influence, he satisfied that burden by demonstrating that Moretti had the advice of independent legal counsel in formulating his estate plan and in drafting and executing his will. Pagliarani relies on a general observation in *Cleary* v. *Cleary*, 427 Mass. at 291, made in the context of a breach of a professional fiduciary duty, that the fiduciary's burden of proof was met if the fiduciary showed that the bequest was made with full knowledge and intent *or* with the advice of independent legal counsel. See *Rempelakis* v. *Russell*, 65 Mass. App. Ct. at 569 (finding of independent legal counsel "by itself may be sufficient to end the case regardless of the allocation of the burden of proof"), citing *Cleary* v. *Cleary*, *supra.* Even assuming, without deciding, that we would reduce to a single criterion the fiduciary's burden in responding to a challenge of undue influence in a will contest, that burden was not satisfied here.

Contrary to Pagliarani's assertion, the judge's memorandum of decision set forth findings of fact indicating that Pagliarani had not established the independence of the legal advice provided to Moretti, due to the nature and extent of Pagliarani's involvement with the communications, correspondence, and work product of both Ott and Triantafillou. The judge specifically found that "Pagliarani opened every piece of mail for Moretti and reviewed it with Moretti, including drafts of the new will. Pagliarani made notes on at least one draft, indicating changes he wanted Moretti to make."

Indeed, it was undisputed that Pagliarani wrote comments on

one of the draft wills prepared by Ott. In addition, the judge found, and the record confirmed, that "Pagliarani was directly involved in procuring the attorneys hired by Moretti to draft the 1991 [w]ill and played a substantial role in the drafting process." She further found that "Pagliarani was essentially in control of Moretti's legal representation from January 1991 forward which gave him the opportunity to exercise undue influence over Moretti with respect to the 1991 [w]ill." And tellingly, the evidence also revealed that when Ott began to express his objections to Pagliarani's involvement in Moretti's estate planning, Ott was replaced with Triantafillou, an attorney who not only met and communicated directly with Pagliarani concerning Moretti's will, but who also represented Pagliarani as a client during the same time period.[3,4] See, e.g., *Logotheti* v. *Gordon*, 414 Mass. 308, 311-312 (1993) (attorney preparing will "must have undivided loyalty to the client," in order to determine whether client is free from undue influence). Compare *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 228 (beneficiary did not know that decedent had made will until after it was executed, and did not meet decedent's lawyer until after decedent's death).

5. *The undue influence determination.* Turning to the judge's other findings that supported her determination that Pagliarani failed to meet his burden of proving the absence of undue influence, we are satisfied that the judge applied the appropriate legal standard to the evidence, and that her comprehensive findings were well supported in the record. Factors that support a finding that undue influence was at work in the disposition of property in a will are well established:

"Four considerations are usually present in a case in

---

[3]Triantafillou testified that she proceeded with the dual representation because she had received an opinion from the ethics committee of the Massachusetts Bar Association, advising that she could do so if she made disclosure to her clients and obtained their consent. The judge found, and Triantafillou's testimony confirmed, that Triantafillou could not remember what information she provided to the committee regarding the details of the representation, particularly with respect to Pagliarani.

[4]Moreover, the will prepared by Triantafillou, and ultimately executed by Moretti, was identical in all material respects to the version drafted previously by Ott, and it was during Ott's representation that the documentary evidence confirmed Pagliarani's direct participation in the drafting process.

which a supportable finding of undue influence has been made. These involve showings that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means."

*Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 223 (1986), citing *Neill* v. *Brackett*, 234 Mass. 367 (1920). See *O'Rourke* v. *Hunter*, 446 Mass. 814, 828 (2006).

Our review of the record confirms that there was more than enough evidence to establish the presence of all four factors here, as the judge found. Following a time line of Pagliarani's more blatant maneuvers underscores the judge's findings that in a matter of months, Pagliarani used improper means to take advantage of the opportunity, afforded by Moretti's dependence, to secure Moretti's money and property for himself.

First, and most alarming to the judge, was the overwhelming evidence that almost immediately upon arrival, Pagliarani took steps to isolate Moretti from his long-time friends and advisers. We note that access was denied in particular to those individuals who had been involved in Moretti's estate plan and his financial affairs at the time Pagliarani moved into Moretti's apartment.[5] Isolating the decedent is an oft-cited tactic of those targeting elderly and dependent individuals, in order to gain the opportunity to influence favorable bequests. See, e.g., *Smith* v. *Stratton*, 302 Mass. 17, 23 (1938) (evidence of undue influence by petitioner caregiver, who was listed in decedent's will to take residue of decedent's estate after gift to convent, included isolating decedent, who was elderly and without family, from visits by nuns); *Livermore* v. *Seward*, 311 Mass. 389, 398-400 (1942) (evidence of undue influence where, within few months of second marriage, decedent's children and grandchildren were no longer permitted to visit, and second wife and her daughters

---

[5]As previously noted, Schiavoni was Moretti's attorney and drafted the 1989 will. Casoni was the principal beneficiary of the 1989 will; her son Joseph, and his wife, Donna, were also among those barred from visiting Moretti. Bergazzi held a power of attorney for Moretti's bank accounts until she was replaced by Pagliarani's power of attorney in January, 1991.

procured disproportionate bequests); *Popko* v. *Janik*, 341 Mass. 212, 214 (1960) (caregiver monopolized conversations with visitors to sickly decedent and answered questions addressed to decedent). Compare *O'Rourke* v. *Hunter*, 446 Mass. at 829 (daughter challenging her mother's will had as much access to decedent during her illness as will's principal beneficiary); *Brogan* v. *Brogan*, 59 Mass. App. Ct. 398, 402 (2003) (no allegations that caregiver limited access of family and friends to testatrix); *Rempelakis* v. *Russell*, 65 Mass. App. Ct. at 569 (no evidence that beneficiaries isolated decedent from friends or relatives).

The evidence similarly warranted the judge's findings that by January, 1991, Pagliarani had injected himself into Moretti's communications with new attorneys, thereby gaining control of Moretti's finances. Thus began Pagliarani's practice, which increased over time, of using Moretti's bank accounts for his own personal benefit. The judge rejected as not credible Pagliarani's explanation that Moretti had authorized Pagliarani's use of approximately $6,755, taken from Moretti's bank accounts, for Pagliarani's personal expenses between January, 1991, and November, 1991.[6] Improper use of the decedent's money and property has been identified in our cases as evidence of the decedent's susceptibility to undue influence and the caregiver's opportunity to take advantage of the decedent's weakened position. See, e.g., *Erb* v. *Lee*, 13 Mass. App. Ct. at 125 (housekeeper's attempts to persuade frail, elderly decedent to give her money, furnishings, and personal items were evidence of undue influence); *Wood* v. *Tuohy*, 67 Mass. App. Ct. 335, 337-338 (2006) (undue influence evidenced when petitioner took control over decedent's finances and began making gifts to herself and her family from his assets). Compare *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 229 (despite her assistance with decedent's bank accounts, beneficiary had no discretion, as "[a]ll checks were drawn at his direction, solely to pay bills, and reviewed and signed by him").

---

[6]Weaker still was any attempt by Pagliarani to justify the extraordinary sums he took for himself from Moretti's bank accounts thereafter, some of it unaccounted for, and some of it spent on Pagliarani's ever-improving lifestyle, including language lessons, health club memberships, hair color and skin care, manicures, music cassettes, wine, restaurants, clothing, tailoring, dry cleaning, and a truly remarkable number of shoe purchases.

The evidence also revealed that by mid-January, 1991, Pagliarani began to play an active role in effectuating a significant change in Moretti's estate plan. Pagliarani assisted Moretti in locating and contacting a lawyer to prepare a new will that would leave his property to Pagliarani. Up until that point, Moretti had used Schiavoni for legal services, including the drafting of Moretti's 1989 will. In these circumstances, the sudden and dramatic change of Moretti's estate plans, leaving his property to a new acquaintance, rather than to his long-time friend and neighbor, Casoni, who had provided care to Moretti and his siblings over the course of several years, was properly viewed by the judge as evidence of an unnatural disposition. See *Erb* v. *Lee*, 13 Mass. App. Ct. at 125-126 (citing drastic change between first will, which left decedent's estate to her grandson, and second will, which left her estate to her housekeeper, who had previously been fired for harassing decedent). Compare *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 224 (decedent's first and only will, leaving property to his former social worker, was not contrary to any prior disposition or stated intent).

As we previously noted, the evidence warranted the judge's findings that after January, 1991, the Casoni family members, along with Moretti's fiduciaries, Schiavoni and Bergazzi, were no longer allowed in Moretti's home. Even among those few individuals who gained access after January, 1991, there were expressions of concern regarding Pagliarani's inappropriate level of involvement, control, and interference in Moretti's affairs. Nagel, appointed as guardian ad litem for Moretti in the conservatorship proceedings, recognized Moretti's passive nature and dependency, and his susceptibility to undue influence; Nagel urged that Pagliarani's influence be checked by oversight and a coconservatorship. See, e.g., *B.W.* v. *J.W.*, 67 Mass. App. Ct. 295, 299 (2006) (susceptibility indicated by trust beneficiary's "limited social interaction and an apparent high level of dependence on a select few individuals"). Compare *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 228 n.11 (decedent described as "a very definite individual" who was neither dependent on beneficiary nor "easily led"). See *Neill* v. *Brackett*, 234 Mass. at 371; *Pollock* v. *Marshall*, 391 Mass. 543, 557 (1984).

Similarly, over the course of Ott's representation of Moretti between January and July, 1991, Ott's correspondence reflected a growing concern with Pagliarani's role in Moretti's estate planning decisions. Ott's recommendation in a June 3, 1991, letter to Moretti that Pagliarani not be involved further in the preparation of the will was followed by his June 11, 1991, letter recommending he serve as a coconservator with Pagliarani, and stating that he was "not interested in discussing with Mr. Pagliarani this matter again." A month later, Ott was fired.[7] Pagliarani then found an attorney, Triantafillou, with whom he could deal directly; indeed, Pagliarani met with her privately and used her as his own attorney. The final step toward creating an opportunity to exercise undue influence, and using that opportunity, was thus complete. See *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 223.

We think the Supreme Judicial Court's observation in *Neill* v. *Brackett*, 234 Mass. at 369, is apt:

"The nature of fraud and undue influence is such that they often work in veiled and secret ways. The power of a strong will over an irresolute character or one weakened by disease, over-indulgence or age may be manifest although not shown by gross or palpable instrumentalities. Undue influence may be inferred from the nature of the testamentary provisions accompanied by questionable conditions, as for example when disproportionate gifts or benefactions to strangers are made under unusual circumstances."

Pagliarani argues that the evidence compelled findings in his favor on the four factors listed in *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. at 223. At trial, Pagliarani made an unsuccessful attempt to put an innocent spin on the steps he took to isolate Moretti from his friends, squander Moretti's money, and

[7]The judge credited the testimony of other friends and medical caregivers of Moretti regarding Moretti's increasing passivity and Pagliarani's efforts to block or discourage their visits. The judge also credited the testimony of a witness who was housesitting for Casoni in the summer of 1991, and who, while outside Moretti's apartment door, overheard Moretti say "but Mary," and Pagliarani shouting back, "I don't care what Mary wanted." Moretti's deceased sister was named Mary.

orchestrate the bequest of Moretti's building to him. The judge, who was "in a better position than we to evaluate" oral testimony, rejected Pagliarani's explanations as not credible, and we defer to her assessment of his veracity. See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 430 (1980).

On appeal, Pagliarani tries another tack, pressing a version of the evidence that downplays his own actions, and instead paints Moretti as decisive, independent minded, and fully informed and engaged in the process by which his money and his property found their way into Pagliarani's hands. "It was for the trial judge to say, taking into account the [decedent's] age and [his] general condition of health, [his] mental constitution and [his] dependence upon some one for care and attention, whether [he] could or could not be unduly influenced." *Erb* v. *Lee*, 13 Mass. App. Ct. at 126, quoting from *Campbell* v. *Lima*, 212 Mass. 11, 13 (1912). At most, Pagliarani's "arguments establish only that the evidence was in conflict, not that the findings were unwarranted." *Rempelakis* v. *Russell*, 65 Mass. App. Ct. at 570.[8]

*Judgment affirmed.*

---

[8]Pagliarani makes much of what he would characterize as some cross-over in evidence from the "equity case." This is a reference to the fact that after the petitions for probate of the 1989 and 1991 wills were filed, Casoni filed a complaint for declaratory relief seeking a declaration that a deed and trust executed by Moretti that transferred the building to Pagliarani were void. The equity action was not consolidated with the will contest present before us. A judgment eventually entered in the equity action declaring the deed and trust void, and was affirmed in an unpublished memorandum and decision of this court pursuant to our rule 1:28. See *Casoni* v. *Pagliarani*, 63 Mass. App. Ct. 1110 (2005). We did not rely on the judge's findings taken from the related equity case, and so we do not reach the question whether the judge made proper use of those findings here. As to the remaining evidentiary issues raised on appeal, Pagliarani's brief on those points does not provide the level of appellate argument required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and they are therefore deemed waived.