SUPERIOR COURT 
 
 GLORIA J. STEERE[1] vs. LYLE STEERE and another[2]

 
 Docket:
 2018-44
 
 
 Dates:
 December 16, 2020
 
 
 Present:
 Paul D. Wilson Justice of the Superior Court
 
 
 County:
 DUKES, ss.
 

 
 Keywords:
 FINDINGS OF FACT AND RULINGS OF LAW
 
 

 In 2016, Defendants Lyle Steere and his wife Aurelie Cordier-Steere purchased the home of Lyle’s 84-year-old aunt Gloria Steere. All three of these parties[3] understood that Gloria would continue to reside in that home, although they testified to different understandings about the duration of her expected residency.
Approximately two years later, in 2018, Lyle and Aurelie began the process of evicting Gloria from the home. This prompted another of Gloria’s nephews, Jesse Steere, III, to apply to the Probate and Family Court to appoint him as Gloria’s conservator. Armed with that appointment, Jesse filed this lawsuit, and obtained a preliminary injunction prohibiting the eviction.
The case ultimately reached trial in October 2020. The parties tried three claims: fraud, undue influence, and intentional infliction of emotional distress.

---------------------------

[1] By her conservator, Jesse Steere, III

[2] Aurelie Cordier-Steere f/k/a Aurelie Cordier

[3] Steere is the last name of Lyle and Gloria, and a portion of the last name of Aurelie. Steere is also the last name of Jesse Steere III, another of Gloria's nephews who brought this lawsuit on her behalf in his capacity as her conservator. Steere is also the last name of another relative of the parties, Gloria's brother David, who will be mentioned in this decision. For clarity, therefore, I will use first names to refer to anyone whose last name is, in full or in part, Steere.

-1-

I presided over a non-jury trial that spanned five days between October 6, 2020 and October 16, 2020. Seven fact witnesses testified: Gloria and her conservator Jesse; Lyle and Aurelie; Gloria’s brother David; and two persons whose jobs bring them into contact with elderly persons on Martha’s Vineyard, Rose Cogliano and Nancy Langman. In addition to these fact witnesses, I heard from two expert witnesses, Dr. Barry Fogel and Dr. Julia Reade.[4] The parties introduced 61 exhibits, some of them consisting of many separate documents.
Findings of Fact
Based on all the credible evidence presented at trial, and all the reasonable inferences drawn from that evidence, I find the following facts.
1. The Property
In the 1950s, Gloria’s future husband purchased undeveloped property at 56 Bay View Avenue in Oak Bluffs. Over several years, Gloria and her future husband built a residence on that property. When they married, her husband deeded the property to himself and Gloria jointly. In or about 1962, they began living in the home they constructed. When they divorced in the 1970s, Gloria became the sole owner of 56 Bay View Avenue (the “Property”). Gloria still resides at the Property, as she has for approximately 58 years.
The property is located on Lagoon Pond in Oak Bluffs. It overlooks Vineyard Haven Harbor, and has 95 feet of private beach. The residence at the Property is a one-story home containing three bedrooms and one full bath.

---------------------------

[4] The two expert witnesses reside and practice in metropolitan Boston, and they testified virtually. All other portions of the trial, including the testimony of the seven fact witnesses, happened live in a courtroom that had been rendered as safe as the Commonwealth could make it in this time of pandemic.

-2-

2. Gloria’s Background
Gloria has no children. Although Gloria comes from a large Vineyard family, David Steere was her only sibling still living on the Vineyard. At the relevant times, Gloria would have dinner at David’s house occasionally, and he and his wife sometimes drove Gloria to family events, particularly if the event was off-island. Most of the next generation of the Steere family had also left the Vineyard. For example, David’s son, Defendant Lyle Steere, lived in Boston. The only member of the next generation of Gloria’s family still on Martha’s Vineyard was her nephew Jesse Steere III. Jesse owns and operates a hardware store in Vineyard Haven. After her retirement in 1997, Gloria would visit him at the store frequently.
Gloria’s formal education ended with her high school graduation in 1950. After working for a year as a nanny, she was chosen to represent Massachusetts in an international farm youth exchange program that sent her to England and Wales. Upon her return, she traveled Massachusetts to discuss what she learned about agriculture in Great Britain. She then found employment as a bookkeeper at a dairy for 10 years.
When she was about 30 years old, Gloria went to work at an insurance agency. After a merger or two, that agency became Martha’s Vineyard Insurance Company, apparently the
largest agency on Martha’s Vineyard. She became the bookkeeper at the agency after working there for about a year. By the time she retired after more than 36 years at Martha’s Vineyard Insurance, she was the treasurer of the company, and, she testified, “Everyone called me the CFO, although I thought of myself as a bookkeeper.” Although she was the only accounting employee, because of her stature at the agency the company’s approximately 30 employees were under her supervision to a certain extent. Most of her duties were financial, such as closing the books of the agency at the end of each month. Among her other duties were handling financial

-3-

relations with insurance companies, and handling the agency’s payroll. Gloria retired from Martha’s Vineyard Insurance in July 1997.
When Gloria retired, she had amassed savings of approximately $800,000. She could easily handle all her expenses. She became active in the activities of the Oak Bluffs Senior Center, and traveled on what she called “senior trips,” including to Europe. She took care of the Property, finding particular pleasure in gardening and landscaping. She also spent a lot of time reading.
3. The Scams
Beginning in 2012 or 2013, Gloria fell victim to telephone scammers. The first scammers told her that she had considerable money waiting for her in a bank account, but she had to send money for expenses like escrow fees to get the money out of the account. She began sending cash, mostly by Federal Express, to the addresses specified by the scammers.
Gloria also received scam calls of a more threatening nature. When she stopped sending money because she was running out, one scammer threatened to come to the Vineyard and check out the Property, to see what he could do to get the money that she supposedly owed.
By early 2014, she had sent her life savings to the scammers, and was essentially living on Social Security. Over the year or two in which she was victimized, she never mentioned the calls, or her actions in response, to any of her relatives or friends. Now, however, sometimes unable to pay for expenses of daily life, she reluctantly turned to her family, telling two of her siblings, her brother David and her sister Rosemary (who does not live in Massachusetts), about the scams. Both siblings were sympathetic. David began lending small amounts of money to Gloria.

-4-

David, a retired police officer, suggested that Gloria report the scams to the Oak Bluffs Police Department, which she did. Gloria provided police with her notes about the calls and the amounts she sent. The police told her to stop answering the calls and to stop sending money.
The police investigated, and reported the matter to the Federal Bureau of Investigation, which then contacted Gloria. But no scammers were found and no money was recovered.
Seeking additional funds on which to live, Gloria set up an appointment with a reverse mortgage lender. At her request, David accompanied her to meet with this lender. Gloria asked David his opinion about the reverse mortgage, and he replied that it was her decision. In testimony that I credit, David said that he did not believe it was his place to prevent Gloria from gaining access to another large sum of money.
Gloria obtained the reverse mortgage, which is Exhibit 1. That mortgage, which Gloria signed on January 29, 2014, says that the maximum principal amount that could be lent to Gloria was $938,250. However, in testimony I credit, Gloria said that she believed that only $450,000 was actually available to her. She took $200,000-$250,000 immediately, and considerably more over the next two years.
Unfortunately, the scammers continue to call. Even more unfortunately, Gloria continued to send them money. Although David had urged her to stop sending any money, she neither heeded that advice nor consulted David (or anyone else). Eventually she exhausted the reverse mortgage funds as well, primarily by sending those funds to scammers, although she did spend some of those funds on expenses related to the Property.
In or about 2015, while visiting her nephew Jesse at his hardware store, Gloria asked to borrow $200. Jesse asked why. Gloria confessed that she lost all her money, and she asked

-5-

Jesse not to tell his uncle David she was asking Jesse for money. Jesse gave her the money she requested.
Jesse also called David. David told Jesse about the scammers, that he had involved the police, and that nonetheless Gloria kept giving away her money. David recommended that Jesse not give Gloria any money.
Nonetheless, Jesse continued to give small amounts to Gloria when she said she needed money to buy medicine or food. He also followed up with David, and got the impression that David was dealing with things by, for instance, pursuing the police and FBI investigation.
Gloria became concerned about her ability to pay the real estate taxes on the Property. She borrowed approximately $3000 from Jesse for one quarterly payment. Other back real estate taxes remained unpaid.
4. The Attempted Stevens Transaction
David Stevens, who lived next door to the Property at 58 Bay View Avenue, had earlier expressed interest in purchasing the Property for his children, and establishing a family compound. David Steere testified that it was “common knowledge” that Mr. Stevens had long coveted the Property. Remembering this, Gloria went to Mr. Stevens, hoping to strike a real estate deal with him that would keep her in her home for the rest of her life.
Mr. Stevens was open to such a transaction. He offered to pay real estate taxes which had accumulated over two or three years, homeowner’s insurance, and other expenses, and Gloria agreed to sell him the property for approximately $500,000. Mr. Stevens also agreed to permit her to live in her home for the rest of her life.
Gloria discussed the possible transaction with David. However, Gloria did not consult a lawyer about her proposed transaction with Mr. Stevens. Nor did Gloria seek professional

-6-

advice from a realtor before she agreed to sell the Property for approximately $500,000. Price was not Gloria’s motivating factor; she was simply searching for a way to live out her life at the Property.
Gloria signed a Purchase and Sale Agreement with Mr. Stevens on December 31, 2015. See Exhibit 16. The purchase price was $501,400. The Purchase and Sale Agreement said that Gloria would deliver full possession of the premises when she delivered the deed. The Agreement did not mention that Gloria would have a life estate, or become a tenant, or have any other right to possession once the transaction closed. Nonetheless, I find that Gloria and Mr. Stevens (who did not testify) did intend that Gloria should live out her years in the house. Such a bargain would be consistent with the fact that Mr. Stevens was not buying the house to relocate there, but rather was buying it for his children’s use, which could await the demise of Gloria, who was then about 84 years old. More fundamentally, I find that Gloria would never have consented to sell her house to Mr. Stevens unless the deal included a condition allowing her to remain in that house for the rest of her life. This was her primary objective in the proposed transaction with Mr. Stevens, and, as will be seen below, in her later sale of the Property to Lyle and Aurelie.
Gloria’s right to stay at the Property for the rest of her life was provided for in a separate document. That document is not before me; Gloria testified that she disposed of that document after she sold the Property to Lyle and Aurelie because she no longer needed it. I credit her testimony that her deal with Mr. Stevens included the right to remain at the Property for her lifetime.
After signing the Purchase and Sale Agreement, Mr. Stevens could not close the transaction. He told Gloria that his accountant and his banker had said that he could not go

-7-

forward. I infer that Mr. Stevens could not afford the expense, perhaps because Mr. Stevens had already paid $48,375 to Gloria or for her benefit. Unable to pay him back, Gloria instead executed a mortgage in his favor in that amount on February 2, 2016. See Exhibit 2. Gloria eventually repaid Mr. Stevens when she sold the Property to Lyle and Aurelie.
5. Gloria Puts the Property on the Market
Her hopes of living out her years at the Property apparently dashed, Gloria consulted a realtor about putting the Property on the market. Gloria told her brother David and her sister Rosemary about the failure of the transaction with Mr. Stevens, and her intention to sell the Property. Both expressed disappointment that she would be forced to sell.
The realtor suggested that the Property be priced at $1,299,000. That sounded reasonable to Gloria, who was aware that the assessed value of the home was more than $1.2 million.
Obviously Gloria would have to leave the Property if she sold it on the open market. But if the Property sold for anywhere near that asking price, she could afford to have a modular home built for her by a builder referred by her realtor. Although the realtor showed the Property several times, Gloria received no offers.
6. The Negotiations to Sell the Property Sale to Lyle and Aurelie
However, the house was not on the market very long, because David told his son Lyle about Gloria’s situation. David and Lyle discussed the possibility of keeping the Property in the family by having Lyle purchase it.
On March 20, 2016, David and his wife brought Gloria to a birthday luncheon on Cape Cod for Gloria’s sister Nancy, who was turning 80. Lyle and Aurelie were among the few members of the next Steere generation who also attended this celebration.

-8-

During lunch, Lyle took Gloria aside and told her that he had heard that she was having problems and he thought he could help. They agreed that, after the conclusion of the luncheon, Lyle and Aurelie would take Gloria to see the venue where Lyle and Aurelie would soon be married, and they could further discuss how Lyle could help. When they took that side trip, Lyle explained that he and Aurelie might be able to purchase the house, so Gloria should take it off the market.
Gloria’s past relations with Lyle had been cordial but distant. He lived in Boston, and she did not see much of him. In the summer Lyle would occasionally visit his parents on the island, and Gloria would have dinner with them at David’s house. Gloria recalled one such dinner at which she met Aurelie for the first time, after Lyle and Aurelie began dating. Gloria
would also occasionally see Lyle at large family gatherings at Thanksgiving or Christmas, some of which Gloria hosted at the Property. They never spoke on the phone, or, as far as the record shows, communicated by electronic means.
The following weekend, by prearrangement between Gloria and Lyle, Lyle and Aurelie came to the Vineyard. They spent a few hours with Gloria, saying, as Lyle testified, that they would “love to help” by purchasing her house. The three of them discussed how such an arrangement would work.
Gloria made clear that her goal in the transaction was to live in the house for the rest of her life. Gloria said that she would want “a lease or something in writing” guaranteeing her right to stay in the property for her lifetime. (Gloria was not familiar with the term “life estate.”) Lyle and Aurelie told her that she would have the right to stay in the property for her lifetime. Lyle then assured Gloria that she would not need a document to protect that right, because “we’re

-9-

family.” Lyle also pointed out that, because he and Aurelie lived in Boston, they would be at the Property mostly on weekends.
Aurelie testified that they also discussed that, as she put it, if Gloria’s “health deteriorated, we would have to figure it out.” I disbelieve this testimony, and similar testimony by Lyle.
Because Lyle and Aurelie would generally be using the Property only on weekends, the parties tentatively agreed that Gloria would pay the routine expenses of running the household, such as utilities. Lyle and Aurelie said that they were not yet in a position to offer a particular price, because they needed to consult their banker or a mortgage lender. Gloria said that she needed at least $500,000 to pay off her reverse mortgage and her debt to Mr. Stevens. She added that she would like to get another $100,000 to pay off other debt.  The parties agreed to talk again after Lyle and Aurelie had figured out what they could afford.
About a week later, on April 2, 2016, Lyle sent Gloria an email, with a copy to Aurelie. See Exhibit 3b. Lyle said the deal “would need to be treated as sale” for the financing to move forward. Lyle then offered Gloria
$500,000 for the house with all the conditions that we discussed (i.e you would live there, but we would own the house and pay for all of the taxes and insurance on the property and any big-ticket items that hopefully will not happen, roof replacement, plumbing, HVAC, etc.) and you would be responsibly [sic] for all of the monthly expenses (i.e cable, phone, electric and heating oil).
Id. Lyle offered to “handle all legal expenses related to the transaction,” and to cover back taxes at the closing. At the end of the email, Lyle added, “We will also need to put in some conditions related to health matters while you are living there that we can discuss as part of the process.” Id. (emphasis added). I find that this is the first mention, and the last mention, of any “health matters” in the written and oral dealings between the parties concerning the sale of the Property.

-10-

I also find that this sole mention concerns “health matters” while Gloria would be living at the Property, and does not suggest that her future poor health would forfeit her right to permanent residence there.
Gloria responded positively to this offer. Later that same day, therefore, Lyle sent another email to Gloria expressing his excitement “that we can help and in return we can keep the property in the family.” Exhibit 3c. Lyle added,
I just want to make sure that we are in agreement that we are treating this as a private/family sale that your real-estate agent will not be involved or take any commissions. After we sign the P&S we can have the listing pulled or marked under agreement.
With regard to communicating with the family, Lyle said,
[W]e would prefer just to keep between us. We are a little concerned with the family dynamics, but if you feel that you want to discuss with the family I would completely understand – this is your call, but from our standpoint we are keeping it private.
Three days after they made the offer by email to purchase the Property for $500,000, Lyle and Aurelie had a lawyer prepare a one-page Offer to Purchase Real Estate dated April 5, 2016. See Exhibit 20. That same day, Gloria electronically signed this document. See Exhibit 3f.
Lyle again emailed Gloria to reiterate that that “we need to get the realtor out of the picture.” Exhibit 3d. Gloria told the realtor to take the property off the market. Gloria then reported this development by email to Lyle, adding that the realtor “is so happy for me that I will be able to continue to live here and the property will remain in the family.” Exhibit 3e. Lyle did not disagree that Gloria would be able to continue to live at the Property.

-11-

As to telling the family, Lyle reiterated his preference that family members – except for his own parents – should not learn of the transaction until after it closed. See Exhibit 3j, Lyle’s email to Gloria dated April 17, 2016. There Lyle said that he
did let mom and dad [that is, David] know yesterday that it is a done deal . . . But I did ask them not to tell others yet. I was thinking that we would communicate after the closing, but I’m not hung up on that either, I just don’t know how people will react – what are your thoughts? Family deals can be tricky.
Lyle then suggested that he and Gloria “come up with a plan” about how to deal with questions from Gloria’s sisters and other nephews and nieces. Id. Later the same day, Lyle sent Gloria another email reporting that Lyle’s parents “are in agreement that we should let the rest of the family know after everything is signed and done.” Exhibit 3l. “Honoring Lyle’s request,” as Gloria put it in her testimony, she told no one in the family about the proposed transaction until after it had closed.
Lyle raised the issue of legal representation in an email dated April 13, 2016. He informed Gloria that he had fired one lawyer and hired a new one.  That lawyer “said that she can represent all of us, meaning Aurelie you and I. I hope you’re okay with that and if not let me know.” Exhibit 3h.
As negotiations proceeded, Gloria again said, this time in writing, that “we should do a lease, from you to me, so everything is up to snuff . . . We could have your lawyer draw it up.” Exhibit 3m. Lyle responded the next day, “I love your idea in regards to a lease and we can discuss that further when we are down there. We don’t need a lawyer for that, we can just put one together on our own for a fraction of the cost.” Exhibit 3n. Lyle and Aurelie never did “discuss that further” with Gloria, and no lease was ever prepared.
Lyle testified that “I changed my mind” about loving the idea of a lease, because he was concerned about the possible effects on his financing the purchase as a second home, and on

-12-

insurance premiums. I find that, even if these were Lyle’s secondary reasons for not wanting to sign a lease, Lyle’s primary reason was that he wanted the Property to be entirely unencumbered by any legal obligation, by lease or life estate or anything else, in favor of Gloria. There was no testimony from Lyle or Gloria that Lyle ever told Gloria he changed his mind, and I find that he did not so inform Gloria. Nor did he ever explicitly tell Gloria that there would be no lease. Similarly, despite Lyle’s mentioning in one email to Gloria that the parties should discuss “health matters,” see Exhibit 3b, neither Lyle, nor Aurelie, nor Gloria testified about any such discussions before the closing, and I find that there were none.
Five days after offering Gloria $500,000 for the Property, Lyle and Aurelie applied for residential loan of $400,000 for the purchase of the Property as their secondary residence. They listed the purchase price is $500,000. See Exhibit 4.
At trial, Lyle testified that he did not know the value of the Property. I disbelieve this testimony, for several reasons. First, Lyle had testified in his deposition that he was aware that that the property was on the market for $1,299,000 at the time he approached Gloria about purchasing it. Second, his mortgage lender commissioned an appraisal of the Property. The appraiser reported her opinion of value to Lyle’s lender, setting that value at $1,400,000 as of April 20, 2016. See Exhibit 59 at page 2 of 33. This is the best evidence of the Property’s market value when Gloria sold it to Lyle and Aurelie, and so I find that the Property was worth
$1,400,000 at the time of that transaction.
Even if the mortgage lender did not tell Lyle about the appraiser’s opinion of value, further evidence that Lyle and Aurelie were well aware of the value of the Property is found in their dealings with The Martha’s Vineyard Land Bank Commission. That body is entitled to a fee – in essence a transfer tax – when residential property changes hands on Martha’s Vineyard.

-13-

Lyle and Aurelie told the Land Bank Commission, in writing, that the assessed value of the property was $1,234,600, but the purchase price was $500,000.  See Exhibit 58 at Form LB 1. To avoid paying a transfer fee on the fair market value of the Property, Lyle and Aurelie signed an Affidavit Claiming Basis for Exemption from Transfer Fee. There they explained to the Land Bank Commission that they were the nephew and niece of the seller, and they checked a box indicating that the difference between the market value and the price they paid “was made as a gift without consideration,” and therefore they were not required to pay a transfer fee based on the full market value. Id. at Form LB 2.
7. The Closing
The closing took place on May 20, 2016 at an outdoor picnic table on the grounds of the Barnstable County Courthouse on Cape Cod. Gloria did not object to the location, because she thought it would be more convenient for Lyle and Aurelie than having them come to the island. Gloria took the ferry from Martha’s Vineyard to Woods Hole, where Lyle and Aurelie picked her up so they could drive her to Barnstable. The only attendees at the closing were the three parties and a closing attorney appointed by the mortgage lender.
The lawyer presented many documents to the three parties, explaining what each one was. Gloria had not seen any of these documents before, and she did not have time to read them carefully, but nonetheless she signed them. The attorney offered Gloria no advice, and she sought none. Among the documents Gloria signed was the deed. See Exhibit 31. There was no lease presented to her, nor did the deed or any other closing document give Gloria a life estate or any other right to occupy the Property once the Property changed hands. Nor, as far as the record shows, did any of the closing documents mention what all three parties agree was another

-14-

provision of their deal, namely that Gloria would pay the utility costs of a property in which she no longer had any legal interest.
Lyle testified that, although he also had not seen the closing documents before, he read each one before signing. Aurelie testified that she also read each document before signing it. I find that this is unlikely, among other reasons because I infer that the closing did not take very
long. It was scheduled for 1:00 o’clock, but began later than that because the parties had trouble finding the attorney on the grounds of the courthouse, and yet the three parties had lunch after the closing. Lyle and Aurelie then drove Gloria back to the island, where they spent the rest of weekend with her at the Property that they now owned.
8. The Parties Reveal the Transaction to Family and Friends
The three parties now began to tell family and friends about the sale. All three of them went to Jesse’s hardware store, at least once and perhaps twice over the course of the weekend of the closing. They informed Jesse that Lyle and Aurelie had purchased the Property, and that Gloria would be able to stay there. Jesse, who was greatly relieved, hugged Gloria in response to this news. No one mentioned the purchase price. No one mentioned that Lyle and Aurelie believed that Gloria would have to leave the Property if her health deteriorated.
As they returned from the Vineyard to Boston two days after the closing, Lyle and Aurelie sent a text message sent to Lyle’s siblings, announcing their purchase. This text message did not mention the price. It did say that Gloria “will continue to live there for the foreseeable future until she is no longer able to live their health wise (hopefully many years away).” Exhibit
32. Lyle and Aurelie still had not discussed this “health wise” topic with Gloria.
Gloria spread the word to her friends, including her next-door neighbor David Stevens, he of the earlier aborted transaction. In none of these conversations with her friends did Gloria

-15-

mention the purchase price. She simply said, to Mr. Stevens and others, that she had sold the Property to Lyle and Aurelie, and that she would be able to continue to live there.
One such friend was Rose Cogliano, the Administrator of the Oak Bluffs Council on Aging who oversaw the Oak Bluffs Senior Center.  Ms. Cogliano had known Gloria for a decade, through Gloria’s regular visits to the Senior Center and participation in its events. I credit Ms. Cogliano’s testimony that Gloria told her that the sale of the Property would solve Gloria’s financial problems and that she and her cat would have life rights to stay at the Property.
9. Gloria Sends Some Proceeds of the Sale to Scammers
Gloria used the proceeds from the sale of the Property to pay off her obligations to the reverse mortgage lender and to Mr. Stevens, thereby getting those mortgages discharged. After closing costs, Gloria’s proceeds were $23,720.74. She used some of the proceeds to repay Jesse for the money had given her, including for one real estate tax payment.
Within two months, Gloria sent some of the remaining money to scammers who called her again. Jesse and Lyle exchange text messages about the situation on July 14, 2016. See Exhibit 34. Both nephews were upset. They met with Gloria at the Property.
During this meeting, Gloria characterized Lyle as “enraged.” Lyle conceded in his testimony that he “broke” Gloria’s landline phone. Both Gloria and Jesse testified that he did this by “stomping” on the phone until it broke, and I credit this testimony. As he did so, Lyle said, “Now you won’t be able to talk to scammers anymore,” or words to that effect.
Lyle then immediately took Gloria to the Oak Bluffs Police Department to report this additional scam. He turned Gloria’s cell phone over to the police.
After that, Lyle took Gloria directly to her bank. Lyle testified, and I find, that he and Gloria opened a new bank account in Lyle’s name with Gloria as the “beneficiary.” They then

-16-

transferred the funds in Gloria’s current account into the new account, over which Lyle had sole control. Lyle also had Gloria tell the Social Security Administration to direct-deposit her Social Security payments into this new account.
At this point Lyle took over paying utilities and other household expenses, some of them with Gloria’s money and some with his own. Lyle then provided Gloria with a $100-a-week “allowance,” from her own funds, to use on food, medication, and other incidental expenses. This amount was sometimes inadequate, and so Gloria had to ask Jesse for money with which to buy medications. He offered to intercede with Lyle about the amount of the “allowance,” but there is no evidence before me that Gloria permitted him to do this, or that he did so.
Lyle’s strategy for dealing with the scammers appears to have worked. Gloria received no further calls from them.
10. Lyle and Aurelie “Refresh” the Property to Achieve a “Clean Slate”
With the notable exception of the confrontation about scammers, Lyle and Aurelie maintained good relations with Gloria as they shared the Property in 2016 and 2017. Gloria lived at the Property full-time, and Lyle and Aurelie visited primarily on weekends. Lyle and Aurelie purchased a boat, and installed an anchorage for it just off the beach at the Property. As Jesse put it, “At the beginning, they were the perfect trio.” The trio would sometimes eat together, either at the Property or occasionally going out to restaurants. Because Lyle and Aurelie were spending workweeks in Boston, on occasion the parties exchanged emails, and those emails were generally affectionate in tone.
In 2018, however, things began to change. Lyle and Aurelie decided that they needed to “refresh” the Property. As Aurelie put it, there was “old stuff everywhere;” the walls were covered with “old wallpaper;” and the house was full of what she characterized as “clutter.”

-17-

Nor was the furniture to the taste of Aurelie and Lyle. In essence, Lyle and Aurelie decided to transform the house from Gloria’s house, in which they felt like visitors despite being the owners, into their own home, in which Gloria would be the outsider. Therefore they began working towards what they called a “clean slate.”
After some discussion – unhappy discussion, as far as Gloria was concerned – the three parties began to work on the house. The impetus was entirely from Lyle and Aurelie, but Gloria participated in sorting and throwing out items. She was not happy with the process, however, for example when Lyle and Aurelie stripped off the wallpaper that she and her husband had installed with their own hands when they constructed the house. Paintings were removed from the walls, family photos boxed up, and Aurelie took down and wrapped up Gloria’s collection of Hummel figures, saying “We don’t need these.” Gloria became particularly upset when she found Lyle taking photographs out of her family albums and putting them in a trash bag.  When she protested these changes, Lyle told her that he and Aurelie were tired of living with an “old person.”
After painting the walls white, and installing new lighting, Lyle and Aurelie purchased new furniture as well. They also bought new appliances, installed new countertops and sinks, and disposed of “years of accumulated junk,” as Lyle described it at trial.
An April 2018 yard sale was the subject of considerable testimony at trial. All three parties testified that the yard sale was Gloria’s idea. All three parties testified that Gloria offered some of the items at the yard sale for free, and that she managed to sell many items that otherwise would have been tossed in the trash or donated. All three parties agree that Gloria kept the proceeds from the yard sale, which amounted to about $600. Therefore I find all these facts to be true. Lyle and Aurelie point to Gloria’s suggestion of a yard sale as an indication that she

-18-

was on board with the changes they were making. I find, to the contrary, that the yard sale was an effort by Gloria to avoid having items that she cherished end up in a landfill. I base this finding in part on testimony by Council on Aging Administrator Cogliano, who came to the yard sale because Gloria asked her to. Ms. Cogliano said that Gloria appeared quite unhappy on that occasion.
Ms. Cogliano had not been to the Property since its sale to Lyle and Aurelie. Now she entered the sun parlor and perhaps the kitchen, and she found that the formerly “warm and inviting and homey” house was now unrecognizable as the house she had last visited in 2016.
During this “refreshing” of the Property, Lyle once more blew up at Gloria, scaring her as he had when he stomped on her phone.  Gloria had always been active in maintaining the grounds of the Property. Lyle and Aurelie regarded those grounds as being “in disarray,” to quote Lyle’s testimony. In the spring of 2018 Lyle and Aurelie told Gloria that they would take over the landscaping for that year, and then the three of them would share those duties in future years.
Lyle then cleaned out the garden shed, throwing away many tools that he regarded as broken, rusted, or unnecessary, regardless of whether Gloria was still using them. In this process, Lyle threw out Gloria’s hand clippers. Gloria bought a new set. Lyle told Gloria that she did not need new clippers, because he and Aurelie were now taking care of the yard. Gloria responded that it was her yard, and that she would work in it, and she left the house with the hand clippers. Lyle followed, ordered her not to touch the bushes, and grabbed the clippers out of her hand. He was enraged, as Gloria described Lyle’s behavior, in testimony that I credit.
Gloria never saw her new hand clippers again.

-19-

11. Lyle and Aurelie Attempt to Find Housing Elsewhere for Gloria
The decision by Lyle and Aurelie to “refresh” the house was based on factors beyond their understandable desire to make it feel like their own. They had decided that living with Gloria, in what she still regarded as her home, “does not work,” as they put it in email they sent to Lyle’s parents and siblings on May 14, 2018. Exhibit 8. Therefore they “need[ed] to figure out a long-term living solution [f]or Glo,” id., that would involve her living somewhere else. To that end, one goal of their campaign to “refresh” the house was to make Gloria feel less comfortable living there, and more willing to leave. Lyle and Aurelie discussed this strategy in their email to Lyle’s family:
It became apparent to us that in order for Glo to realize that 56 Bay View was no longer “her” house, we needed to make significant changes . . . It took 5 full trucks, a busy yard sale, and Bargain Box ads to get a clean slate. This has been a very painful, contentious and ever so exhausting process for us and for Glo. We knew it was not going to be easy and no one said it would be. But we did not expect nor anticipated Glo’s sense of entitlement and sometimes belligerence throughout this process. Glo does not seem to have accepted the true consequences of her actions, including losing everything she worked so hard over her lifetime.
Id. Notably, Lyle and Aurelie did not suggest in this email that Gloria was having any health issues.
“Refreshing” the Property was not the only action Lyle and Aurelie took in their efforts to figure out “a long-term solution” in which Gloria would be living elsewhere. At around the same time that they were refreshing the house, Lyle and Aurelie began to explore the possibility of moving Gloria to housing for the elderly. They contacted Elder Services of Cape Cod and the Islands, seeking help “with elderly housing placement” for Gloria, whom they described as a person “with low income and low asset[s].” Exhibit 9a. They also described Gloria, accurately, as being “in relatively good health.” Id. That organization referred them to the county housing authority, to another entity that provided affordable rental housing for the elderly, and to a

-20-

centralized service connecting people on Martha’s Vineyard with various sorts of community resources. Id. Lyle and Aurelie began contacting these organizations, and soon learned, to their great disappointment, that there was a three- to six-year waiting list for elderly apartments on the Vineyard.
As their hunt for housing for Gloria intensified, Lyle and Aurelie emailed Rose Cogliano of the Oak Bluffs Council on Aging, telling her in an email that “we realize that over the last 2 years that living under the same roof is not a healthy long-term solution for us, or for Glo.” Exhibit 7a. Again, they did not mention that Gloria had any health issues.
In subsequent conversations, Lyle told Ms. Cogliano that he was unhappy living with Gloria in his home, and he asked for Ms. Cogliano’s help in finding housing for Gloria. Lyle mentioned that he and Aurelie wanted to rent out the house occasionally, for financial reasons, which would be difficult with Gloria living there. (Lyle had looked into rental prices, and believed that he and Aurelie could rent out the Property for $12,000 to $15,000 per week.)
Ms. Cogliano told him that long waiting lists for elderly housing were common on the island, and Gloria could only live in a place that would allow her to keep her cat.  Lyle responded that Gloria could not afford a cat. Ms. Cogliano reminded Lyle how important her cat was to Gloria. Lyle responded angrily, mentioning the money the scammers had taken from Gloria, adding that Gloria deserved to be in a room by herself so she could sit there and figure out how she got there. As indicated in this conversation, Lyle believed that it was appropriate that Gloria be punished for her unfortunate decisions concerning the scammers. See also, e.g., his email to his family, Exhibit 8, saying that “Glo does not seem to have accepted the true consequences of her actions, including losing everything she worked so hard over her lifetime.”

-21-

If that was his attitude, Ms. Cogliano asked Lyle, why had he had gotten involved with Gloria at all? Lyle responded that the family did not want to lose the house.
In spite of this unpleasant conversation with Lyle, Ms. Cogliano helped Gloria fill out a housing application, which was then submitted. When Gloria came to the Senior Center for this purpose, Ms. Cogliano observed that Gloria was “despondent,” to quote Ms. Cogliano’s credible trial testimony.
In another email, Lyle asked Ms. Cogliano if she knew who to contact about elderly housing in Falmouth, an option that, he said, had been suggested by Gloria’s sister Janet, a resident of Falmouth. See Exhibit 7c. Ms. Cogliano declined to be helpful in that regard, because she was well aware that Gloria did not want to leave Martha’s Vineyard.
Next Lyle began emailing First Stop Martha’s Vineyard, a social services organization. In an email to that organization dated May 29, 2018, Lyle described Gloria as “our elderly aunt that we have taken in because of a financial and housing crisis that she got herself into.” Exhibit 9b. Lyle went on to say that he had been working with Rose Cogliano of the Oak Bluffs Council on Aging, but that Ms. Cogliano’s history with Gloria “is great for our aunt in regards to understanding her needs and desires, but is not likely great for my wife and I in regards to our needs and desires.” Id. (emphasis added). The reason he needed to find housing for Gloria, Lyle said, was that “our aunt is no longer welcomed at our house.” Id. Once again, Lyle did not mention any worries about Gloria’s health.
Two weeks later, on June 11, 2018, Lyle again emailed First Stop Martha’s Vineyard. This time he said that Gloria “can no longer be in our house as we are only here 50% of the time and she has been falling and is likely very ill with dimensia [sic].” Exhibit 9d. At trial, Lyle explained that he said that Gloria was suffering from dementia “because we were getting no

-22-

response and so I escalated the rhetoric.” I find that Lyle and Aurelie, neither of whom have any medical training, never believed that Gloria suffered from dementia. I also find that she was exhibiting few if any symptoms that could be mistaken for dementia. Finally, I find that she did not suffer from dementia, based on the testimony of the two expert witnesses described below, as well as my observation of Gloria during the trial, two years after Lyle’s email about dementia.
Lyle and Aurelie did not hide from Gloria these efforts to find housing elsewhere for her. Lyle began telling her regularly that the Property was not her house, that she was a guest in his house, and that she needed to find another place to live.
12.  Gloria’s Falls
Gloria had a history of occasional falls. She suffered a serious fall, resulting in a brain injury, in 2010, well before the events at issue here. I will return to that fall below, when I discuss expert opinion about the state of her brain.
In testimony that I credit, Gloria’s brother David described a fall suffered by Gloria when she was visiting his house for dinner. As Gloria was moving from the living room to the dining room for dinner, she stumbled and fell over backwards. David observed no bruises, although he did not look for them. Gloria then ate dinner with David and his wife and Lyle and Aurelie, and appeared to David to be fine.
Lyle testified that he and Aurelie “witnessed” three falls by Gloria. One of them was the fall at his father David’s house, described immediately above. On another occasion, when Lyle and Aurelie arrived from the mainland, Gloria had bandages on her face. She explained that she had gone outside to get her cat and had fallen, bloodying her face and her knee. On the third occasion, Gloria fell down in the Florida room of the Property, and broke her glasses. (David also mentioned that Gloria had once broken her glasses in a fall, which he did not witness.)

-23-

Aurelie testified that she “saw two or three falls,” providing details only concerning the falls at David’s house and in the Florida room that broke her glasses. Except for Lyle’s imprecision about actually “witnessing” these falls, I generally credit the testimony of Lyle and Aurelie that that Gloria fell three times during the two years that the three of them lived together, at least part-time, at the Property. This testimony is generally consistent with Gloria’s testimony that she fell maybe once a year.
I also credit the testimony of Lyle and Aurelie that Gloria rebuffed their attempts to take her to the doctor concerning these falls. However, in 2019 Gloria’s nephew Jesse pressed harder, and convinced her to seek medical help, which resulted in operation on her leg that has made her more stable since.
The Appraisal Report in the record before me indicates that the house on the Property has only one floor. See Exhibit 59 at page 4 of 33. When Lyle and Aurelie expressed concern about Gloria’s falls as they searched for alternative housing for her, they were not being sincere, I find. Just as Lyle never believed that Gloria suffered from dementia, Lyle and Aurelie never believed that Gloria’s occasional falls made it unsafe for her to live at the one-story Property. Indeed, because of the preliminary injunction in this case, Gloria has lived at the Property, alone, for well over two years, without incident. (Since the issuance of the preliminary injunction, Aurelie and Lyle have been to the Property only a couple of times, to pick up belongings.)
13. The Investigation by Elder Services of Cape Cod and the Islands
Gloria told some friends that Lyle and Aurelie were trying to make her leave the Property. Among those friends was Ms. Cogliano, who credibly described Gloria as “nervous, concerned, and not herself.” Ms. Cogliano had always believed, based on what Gloria told her, that Gloria had the right to stay at the Property for the rest of her life. She now became

-24-

concerned that, by attempting to change that arrangement, Lyle and Aurelie were taking advantage of Gloria in a manner that might constitute elder abuse under Massachusetts law. She was also concerned for Gloria’s physical safety while she was in the same house as Lyle and Aurelie.
Ms. Cogliano contacted Nancy Langman, who runs a family service organization that performs evaluations of the safety of elderly persons. At Ms. Cogliano’s request, Ms. Langman met with Gloria, whom she did not know, at the Oak Bluffs Senior Center. Ms. Cogliano was present at the beginning of the meeting, but then left. Ms. Langman had an hour-long discussion with Gloria that covered, among other things, what was happening between Gloria and Lyle and Aurelie generally, and the conditions and atmosphere at the Property. In her testimony at trial, Ms. Langman specifically recalled Gloria expressing fear about the safety of her cat, because Lyle was unkind to the creature. At the conclusion of this meeting, Ms. Langman told Gloria that, because Ms. Langman’s position made her a mandated reporter of potential elder abuse, she was now obligated by law to report the possibility of such abuse in Gloria’s case. Her own role would end, she explained, when she made her report to Elder Services of the Cape and Islands.
Ms. Langman made that report. Elder Services informed her that her report had been “screened in,” which, she explained, meant that it would be investigated. As is customary in Ms. Langman’s experience in making such reports, Elder Services never contacted her to let her know the results of its investigation.
Ms. Cogliano also filed a report with Elder Services, telling the agency that she was concerned for Gloria’s safety. She also reported her understanding that Lyle and Aurelie had represented that Gloria would stay in the house for life, but now the “situation had turned out to be something else,” as she delicately put it in credible testimony. A representative of Elder

-25-

Services contacted Ms. Cogliano, who arranged two meetings between this investigator and Gloria at the Senior Center. Months later, that Elder Services investigator told Ms. Cogliano that one result of the investigation was that Elder Services had contacted the District Attorney to describe Lyle’s possible elder abuse of Gloria.
In his email to First Stop Martha’s Vineyard in which he “escalated the rhetoric” by claiming that Gloria was “likely very ill with [dementia],” Lyle stated that he and Aurelie, too, had “opened a protective services case for our elderly aunt.” Exhibit 9b.  That email also reported that he filed a police report three days earlier, and was told that the Oak Bluffs Police Department would touch base with Ms. Cogliano at the Oak Bluffs Council on Aging to discuss Gloria’s situation.  Id.  Neither Lyle nor Aurelie testified about why they filed the police report or the protective services case, or about the contents of these reports, or the outcomes of any resulting investigations. I find that these reports were attempts to incentivize public agencies to find alternative housing for Gloria, in the same manner that Lyle had earlier employed “escalated rhetoric” about dementia in his appeals to the social services agency.
14. Jesse confronts Lyle at the Property
On August 24, 2018, Gloria’s nephew Jesse learned that Lyle and Aurelie were attempting to move Gloria out of the Property. Gloria had not wanted to involve Jesse, and so Jesse learned about the threat of eviction from the Elder Services representative who contacted him during her investigation. Jesse called Gloria, and said he would come over that evening to discuss the matter with Lyle and Aurelie, once they returned from a day on their boat.
That evening, Jesse drove to the Property with his life partner Belinda. Gloria welcomed them into the house. Jesse was “really upset,” as Gloria put it in her testimony. Gloria added that Jesse “exchanged words” with Lyle, in such a loud voice that Gloria told him to quiet down for fear that the neighbors would hear them. I credit this testimony. I also credit Lyle’s testimony that Jesse was shouting profanities and calling Lyle names, but I do not believe Lyle’s testimony that Jesse physically threatened him, nor do I believe Aurelie’s testimony that Jesse “attacked Lyle physically,” testimony that she later amended to “lunged at Lyle.” To the contrary, I credit the testimony of Jesse and of Gloria that Jesse neither made physical threats nor any movement toward physically attacking Lyle.
At one point Lyle called his father David, and handed the phone to Gloria. Gloria told David that she could not speak with him at that moment. Lyle then gave the phone to Jesse, who walked outside to talk to David privately. Jesse accused David of being involved with Lyle’s efforts to move Gloria elsewhere. David responded that he was angry because of the involvement of Elder Services, perhaps wrongly assuming that Jesse had asked for that investigation. Further name-calling ensued, mostly on Jesse’s part. Eventually Lyle came outside and reclaimed the phone from Jesse.
The situation became calmer over the course of the visit, which lasted approximately 45 minutes. In less strident tones, the parties discussed Lyle and Aurelie’s views about Gloria’s future at the Property. They resolved nothing, but Jesse left the meeting hopeful that perhaps he and Lyle and David and maybe Gloria’s sister Rosemary would be able to resolve the issues between Gloria and Lyle and Aurelie. This was not to be.
The next day, three things happened. First, Jesse told a close friend about the events of the previous evening. That friend’s wife communicated with Jesse by social media to express her sympathy for Gloria. Jesse responded in full as follows:
Thank you she has a lot of people on her team. Elder services are going to the DA. NOT GOOD they want to have them indicted. Piece of shit.  I chewed a new asshole over there last night. Told him to stop abusing my aunt. Smirky little asshole. I get like throwing him trough [sic] the fucking wall.

-27-

Exhibit 48 (grammar and spelling in original). This posting was publicly accessible for a short time, until Jesse took it down “as stupid,” he testified. However, before Jesse took it down, Aurelie read it, and captured it by screenshot. Her reaction, she credibly testified, was that this posting “added to the insult of the night before.” When she showed it to Lyle, he credibly
testified, his reaction was that Jesse was an “ignorant bully,” for whom the matter might not be over. I also credit the testimony of Lyle and Aurelie that they were shaken by the encounter with Jesse. I find that this is one reason that Lyle and Aurelie never slept at the Property again, although another reason is that they planned to commence formal eviction proceedings against Gloria in the near future.
Second, Jesse received a text message from David, which said, in full, “You are digging yourself a deep hole. Be sure your closet is clean. Sorry it has come to this.” Exhibit 54. Jesse regarded this text as a threat. Jesse did not respond to this text. There was no evidence at trial of any subsequent dealings between Jesse and David.
Finally, also on the day after the confrontation, Lyle called the Oak Bluffs Police Department. He left a message for Lieutenant Williamson, whom he knew from his and Gloria’s dealings with the police about the scammers.
15. Lyle and Aurelie Obtain Various Orders, Mostly Temporary
On the Monday following his encounter with Jesse, Lyle met with an attorney. His purpose was to discuss how to evict Gloria from the Property. After this meeting, Lyle and Aurelie made several filings, none of them yet involving an actual eviction.
First, they went to the police station to fill out a Trespass Notice against Jesse, prohibiting him from coming to the Property. See Exhibit 10. Although the Trespass Notice shows a date of issue of August 24, 2018, the date of Lyle’s evening encounter with Jesse at the

-28-

Property, I find that the trespass order was not issued until a few days later, most likely on August 28, the date of the various criminal and protective order complaints filed by Lyle and Aurelie that I next describe.
On August 28, Lyle and Aurelie filed criminal assault complaints against Jesse. A clerk magistrate held a hearing, attended by Lyle, Aurelie, Jesse, his partner Belinda, and Gloria. Jesse testified credibly about the result of that hearing: the matter was left open for six months, after which it would be dismissed. No documentary evidence about this proceeding was introduced before me. Jesse’s lawyer later told him that the complaints had been dismissed.
On the same day, Lyle and Aurelie filed four Complaints for Protection from Harassment under M.G.L. c. 258E. Both filed Chapter 258E complaints against Jesse. In support of these petitions, both Lyle and Aurelie signed affidavits describing their versions of the confrontation of August 24, the social media “threats” of the next day, and alleged continuing defamation of their characters to other family members on social media (of which there was no evidence before me). They also each swore that that “[p]hone records shows that he continues to corroborate [sic] with potentially others.” Exhibit 11. The cited “phone records” belonged to Gloria, whose phone records Lyle and Aurelie had checked online, through their power as the holders of Gloria’s telephone account. Apparently they found that Gloria had spoken to Jesse by telephone in the days since the confrontation.
After ex parte proceedings on August 30, 2018, a judge issued each of these two requested Chapter 258E Harassment Prevention Orders against Jesse. The orders required, among other things, that Jesse remain away from the residence of Lyle and Aurelie. Id.
At the same time that they filed these Chapter 258E Complaints for Protection against Jesse, Lyle and Aurelie each also filed a Complaint for Protection against Gloria herself.

-29-

According to the affidavits signed by each complainant, their theory was that Gloria “used our joint living situation to co-conspire against us,” resulting in a domestic dispute with Jesse. Id. Lyle and Aurelie each added that Gloria’s phone records revealed that she is still communicating “and potentially corroborating [sic]” with Jesse and “maybe others.” Id. Both Aurelie and Lyle further stated, under oath, “We believe that Gloria is now a threat to our home and our family and she sits right in our living-room.” Id. For that reason, they asked the court, among other things, to order Gloria to stay away from their residence, namely the Property. They also asked that Gloria be ordered to pay them “$TBD” in compensation for “loss of property use due to fear of retaliation & continued corroboration via criminal complaint.” Id. At the ex parte hearing at which the judge issued the two temporary orders against Jesse, the same judge denied the applications for harassment protection orders against Gloria. Id.
As is the practice concerning ex parte Chapter 258E harassment orders, the court promptly held a follow-up hearing, on September 7, 2018, as to the ex parte orders against Jesse. This time the judge wrote on both ex parte orders, “Both parties present. After full hearing, order not extended.” Id.
16. Lyle and Aurelie Began Eviction Proceedings
Four days after the judge vacated the harassment protection orders against Jesse, Lyle and Aurelie had their lawyer send Gloria a formal Notice to Quit, on September 11, 2018. This letter informed her that her tenancy at will would be terminated as of October 31, 2018, and that she was required to deliver up the premises by that date. Not only did the attorney send the Notice to Quit by certified mail, but he had the Dukes County Sheriff serve it on Gloria in September 13, 2018. See Exhibit 13.

-30-

Shortly thereafter, Rose Cogliano encountered Gloria on the streets of Oaks Bluffs. Ms. Cogliano testified that Gloria “looked lost and upset,” and appeared to be in “the worst condition,” emotionally speaking, in which Ms. Cogliano had ever seen her. Gloria told Ms. Cogliano that she needed her help. Lyle and Aurelie had served her with a Notice to Quit the Property, she said. Ms. Cogliano asked Gloria to follow her back to the Senior Center in her car, which Gloria did. Ms. Cogliano then comforted Gloria, after which she called Jesse. Jesse and Gloria then spoke, although Ms. Cogliano was not a party to that conversation.
In the conversation (or conversations) that followed, Gloria asked Jesse to help her deal with the eviction by being appointed her conservator. Jesse was already serving in that role for another elderly relative on the mainland, and he agreed to apply to the Probate and Family Court for appointment as Gloria’s conservator. Jesse already had an attorney representing him in connection with the criminal complaints and the Complaints for Protection from Harassment, and so he and Gloria consulted that attorney. The attorney prepared the necessary petition, and on September 25, 2018, the Probate and Family Court appointed Jesse as Gloria’s temporary conservator. The court later made the appointment permanent on December 12, 2018.
Meanwhile, Lyle and Aurelie continued to insist to Gloria, both in conversations and in writing, that she leave the Property. For example, an email dated September 26, 2018 entitled “Follow-up to our conversation,” they reiterated that she would have to leave the Property by October 31. They said that the Notice to Quit was a “legal document,” and it was “important that you take this legal document seriously.” They recommended that she reach out to service providers, naming four people at various organizations, including Ms. Cogliano, who could “help guide you through the process and provide [housing] options either on or off island.” Exhibit 3s. Gloria responded the next day with an email that I quote in full: “Hi I talked to Elder services but

-31-

I am very sad. I was supposed to be able to stay here for my life. This is very hard since we’re family and I am extremely upset.” Exhibit 3t. The response from Lyle and Aurelie the next day read, in full, as follows: “I wouldn’t let your personal emotions get in the way of reality, which is that you have to vacate our property at 56 Bay View Avenue, Oak Bluffs MA 02557 by October 31, 2018 as per the hand delivered eviction notice (i.e. Notice to Quit).” Exhibit 3u. Two years later, as she discussed these emails at trial, Gloria was still upset about them, crying during her testimony.
Jesse then filed this lawsuit on Gloria’s behalf as her conservator. On October 11, 2018, Judge Moriarty of this court entered the following preliminarily injunction: “After Hearing the Court finds that the plaintiff has a reasonable likelihood of success on the merits and will suffer irreparable harm if the evicters are allowed to proceed. Accordingly the defendants are enjoined from proceeding with the eviction of Gloria Steere pending a final hearing on the merits.”
17. Emotional Effect of Lyle and Aurelie’s Actions on Gloria

From the beginning of the efforts of Lyle and Aurelie to “refresh” the house in early 2018 until the injunction issued in October 2018, Gloria suffered considerably because of the actions of Lyle and Aurelie. Her unhappiness about her living situation, and later her uncertainty about whether she could even stay at the Property, caused her extreme stress. I credit the testimony of Gloria herself, and of Ms. Cogliano, that Gloria was unhappy, upset, and ultimately despondent over the course of these months. Jesse provided some similar testimony, which I also credit.
In particular, Lyle and Aurelie’s demand that Gloria leave the Property affected her emotionally to such an extent that she was no longer her usual self. I find that Lyle and Aurelie intended to inflict serious emotional distress upon her as part of a campaign to convince her to leave, for example by having the Sheriff come to the Property to serve a duplicative, and

-32-

therefore unnecessary, copy of the Notice to Quit. Gloria’s stress was heightened by the fact that she felt betrayed by her own family. In fact, she complained about this betrayal at the time in writing to Lyle and Aurelie, and they intentionally used their family status to make Gloria feel even worse about her situation.
Gloria talked with close friends about her situation, but, as she testified, there was nothing that they could do to solve her problems.  That reality led to further stress and frustration. Gloria consulted her physician, who offered to prescribe anxiety medication, an offer that she refused because “I didn’t want to start those drugs,” as she credibly testified.
18. Gloria’s Susceptibility
I had ample opportunity to observe Gloria, who was 88 years old at the time of the trial. She attended trial each day with Jesse, and testified for a good part of one trial day. She is intelligent and articulate. Her memory about important matters was generally good, but not perfect about details such as the years in which events occurred. On a few occasions she corrected testimony she had given a few minutes earlier.
The parties introduced considerable evidence about the state of Gloria’s brain. In 2010, Gloria fell and hit her head. Images were taken of her brain. Those images showed that she had suffered a significant stroke or strokes some time previously. The images also showed brain atrophy that was a little worse than would be expected for a person of her age.
In 2018, in connection with the Jesse’s conservatorship petition in the Probate and Family Court, Dr. Charles Silberstein, a geriatric psychiatrist, examined Gloria. Dr. Silberstein’s resulting Medical Certificate began by explaining to the court that, “[d]ue to brain damage [Gloria] is unable to manage decisions independently with regard to any management of
financial affairs.” Exhibit 53 at 1. Furthermore, Dr. Silberstein stated, “Ms. Steere has a lack of

-33-

awareness of the extent of her deficits, making her particularly vulnerable to exploitation.” Id. at 2. In the same document Dr. Silberstein also said, “Due to Ms. Steere’s brain damage, her judgment is severely impaired. This is compounded by a lack of awareness of the extent of her impairment leaving her unable to complete some tasks and vulnerable to exploitation.” Id. at 3. Finally, Dr. Silberstein told the Probate and Family Court that Gloria

is fully competent to decide where she wants to live, whether she wants to take medication or who she wants to live with. She remains articulate and verbally intact. She has the ability to participate in all major decisions . . . [but] [p]oor executive function interferes with carrying out complex tasks and with planning. Furthermore, her lack of awareness mentioned above makes it likely that she will continue to make errors of judgment without adequate supervision.
Id. at 4.
Behavioral neurologist and neuropsychiatrist Barry Fogel testified as Gloria’s expert witness at trial. (Dr. Silberstein had consulted Dr. Fogel in connection with his preparation of the Medical Certificate for the conservatorship petition.) In preparing to testify, Dr. Fogel did not examine Gloria, although he did everything else that one would expect a testifying expert to do. I generally credit Dr. Fogel’s testimony.
Dr. Fogel explained that mental competency is “not binary.” It is not uncommon for older adults to appear cognitively intact even though they no longer have the judgment to deal with large sums of money, real estate, or other assets. In fact, “Falling for financial scams is often the first sign of neurodegenerative diseases and other progressive brain disorders in older people, preceding more obvious problems with instrumental activities of daily living.” Exhibit 15, Plaintiff’s Expert Disclosure, at 3. I find that Gloria’s ability to intelligently make important financial decisions had degenerated considerably by the time that the scammers began calling her, and I accept Dr. Fogel’s testimony that this finding is consistent with her brain images from 2010.

-34-

This is not a medical condition that improves over time. It is not surprising, therefore, that when Dr. Fogel examined Gloria’s next set of brain images, taken in 2018, he found no signs of any new strokes, but did see continued brain atrophy since 2010. I find that Gloria’s inability to intelligently make important financial decisions had not improved between 2012 and 2013, when she fell prey to the scammers, and 2016, when she sold the Property to Lyle and Aurelie.
In Gloria’s case, unfortunately, the brain damage caused by her earlier stroke or strokes occurred at a location in the brain that also caused her to suffer from what Dr. Fogel called “poor metacognition.” In other words, Gloria lacked awareness that she had deficits in her cognitive ability to deal with sizable financial transactions. This explains, at least in part, why she continued to give money to scammers even after being told by her brother David, the Oak Bluffs police, and the FBI that this was a bad idea. This poor metacognition also explains why she never felt the need to consult with any relatives or friends about her decisions to send huge sums of money to the scammers – and, for that matter, about her decisions to sell the Property at a bargain price first to Mr. Stevens and then to Lyle and Aurelie. Gloria’s lack of self-awareness in this regard also explains why Gloria was “very clear” in telling Defendants’ expert witness as recently as December 2019 “that she did not think she was suffering from any cognitive or psychiatric condition that impaired her ability to understand or agree to” the decisions she made in selling her house to Lyle and Aurelie in 2016. Exhibit 56, Psychiatric Evaluation by Defendants’ expert witness Julia Reade, M.D., at 12.
Lyle and Aurelie make much of the fact that Gloria had been a competent, high-ranking and money-savvy employee of a sizable business enterprise before her retirement in 1997. I put little stock in this fact, because in 1997 she likely had not yet suffered her stroke or strokes.

-35-

And, of course, her brain had undergone nearly two decades of atrophy between her retirement and her transaction with Lyle and Aurelie.
Defendants’ expert witness Dr. Reade, a general and forensic psychiatrist, met with Gloria for more than an hour in December 2019. From that interview, and her review of medical records, images, and other materials, Dr. Reade concluded that “there is no evidence suggesting that Ms. Steere has ever experienced any form of brain dysfunction such as would interfere with her ability to decide to sell her home or make other important life decisions.” Id. at 14.
As for her history with the scammers, Dr. Reade stated, “Falling victim to scammers can be an early sign of a dementing process, but it can also be unrelated to an individual’s
cognition.” Gloria gave away her life savings, Dr. Reade concluded, not because of any brain damage, but because “she found the scammers’ assertions compelling and believable.” Id. at 13. If that is so, then Gloria was susceptible to poor decision-making in major transactions, whether or not her susceptibility resulted from brain damage. And, if that is so, Gloria was probably even more likely to find scammers’ assertions “compelling and believable” if those scammers were her relatives rather than perfect strangers.
Gloria explained to Dr. Reade that she knows that the scammers duped her, id., which Dr. Reade takes as evidence that Gloria could not be duped again. I do not accept this premise, because Dr. Reade’s opinion is at odds with Gloria’s history, in which: (1) she never figured out that she was being duped until her life savings were gone; and (2) even after having been advised not talk to scammers by relatives and the police, she took out a reverse mortgage to provide funds she needed to live on – and then sent the scammers most of those funds; and (3) even later, when she sold the Property to Lyle and Aurelie, she sent scammers part of her scant net proceeds from that sale.

-36-

Dr. Reade is also impressed that Gloria “has taken steps to ensure that she does not succumb [to scams] in the future.” Id. Those steps are that Gloria will not answer the phone if she does not recognize the number, and that she would hang up the phone if a scammer called her again. Id. It is notable that Gloria’s solution to the problem does not include consulting family or friends before engaging in significant financial transactions. Gloria’s approach to protecting herself, as reported by Dr. Reade, actually suggests that Dr. Fogel is right when he points to Gloria’s lack of self-awareness about her cognitive problems in engaging in sizable financial transactions.
Rulings of Law

I. Liability
Gloria brings three claims against Lyle and Aurelie: undue influence, fraud, and intentional infliction of emotional distress.
1. Undue Influence
Gloria bears the burden of proving undue influence. See Tetrault v. Mahoney, Hawkes, & Goldings, 425 Mass. 456, 464-465 (1997). To prevail on a claim for undue influence, Gloria must prove four things: that she made an unnatural disposition of her property; that she was susceptible to undue influence; that Lyle and Aurelie had an opportunity to exercise undue influence; and that they used that opportunity to procure property by improper means. O’Rourke
v. Hunter, 446 Mass. 814, 828 (2006). Gloria has proved each of these elements.
There can be little doubt that Gloria made an unnatural disposition of her property. I have found that the Property was worth $1.4 million, the valuation listed in the appraisal obtained by the lender for Lyle and Aurelie. Yet Gloria took the property off the market and sold it to Lyle and Aurelie for approximately one-third of its actual value.

-37-

Their $500,000 purchase price did not make the sale an unnatural disposition, Lyle and Aurelie argue, because in return for the discount they agreed to let Gloria, then 84 years old, live in their house for as long as her health permitted. But this is not the transaction set out in the deed and other closing documents they presented to Gloria, which contained no mention of Gloria’s right to remain at the Property for even one day after her disposition of the Property.
Furthermore, Lyle and Aurelie did not even live up to the deal as they describe it, because they did not wait for Gloria’s health to deteriorate. Instead, after only two years of co-habitation they attempted to force her out because, as they told a social service agency in writing, “our aunt is no longer welcomed at our house.” Exhibit 9b. The inconvenience of living with Gloria until they decided not to live with Gloria is hardly worth the $900,000 discount in the sale price. Gloria’s disposition of the Property for this discount price, reserving no legal right to stay at the Property, was unnatural.
I also have no trouble ruling that Gloria was susceptible to undue influence. Gloria, an elderly woman suffering from brain damage, had been fooled in 2012 and 2013 into giving her life savings to strangers promised her merely money, which (at the time) she did not need.
Gloria’s susceptibility was even greater in 2016, in two respects. First, she was now being promised something she needed very badly, the right to stay in her home for the rest of her life. Second, the people making the promise were not strangers on the telephone, but members of her own family, including the son of her geographically closest, and perhaps emotionally closest, sibling.
Neither expert witness believed that Gloria was mentally incompetent. But that is not a prerequisite for being susceptible to undue influence. Neill v. Brackett, 234 Mass. 367, 369-370 (1920) (“When the donor is enfeebled by age or disease, although not reaching to unsoundness of

-38-

mind, and the relation between the parties is fiduciary or intimate, the transaction ordinarily is subject to careful scrutiny . . . Age, weakness and disease are always important factors.
Relations of intimacy, confidence and affection in combination with other circumstances are entitled to weight”). It does not matter if Gloria’s susceptibility arose from an actual brain injury as Dr. Fogel suggests, or if she was susceptible to undue influence simply “because she found the scammers’ assertions compelling and believable,” to quote Dr. Reade. The fact remains that she put more than $1 million, in cash, into Federal Express packages, and sent that money off to strangers, in response to stories that most people would have rejected in an instant. And the fact remains that she was not aware of her blind spot, seeing no need to ask her trusted friends, or relatives with whom she was in regular contact, about whether this was a good idea. Her even greater susceptibility to the importuning of her own relatives, therefore, cannot be disputed.
Next, I rule that Lyle and Aurelie had the opportunity to exercise undue influence over Gloria. Lyle’s father David was Gloria’s confidant. It was David to whom Gloria turned when her life savings had flown off to the scammers. It was David who accompanied Gloria, at her request, to her meeting with the reverse mortgage lender. It was David who observed as Gloria attempted to sell her house for $500,000 to Mr. Stevens in return for the right to stay there for life, and then watched that deal crater. In short, David was fully versed concerning Gloria’s susceptibility. David also knew that Gloria was willing to sell the Property for $500,000 – not coincidentally, the exact price ultimately offered by Lyle and Aurelie – in return for the right to live out her life there. David passed all of this information on to Lyle, as they discussed whether it might be possible to keep the Property in the family.
Lyle then decided to drive down to the Cape to attend his Aunt Nancy’s 80th birthday party, because he knew that David was bringing Gloria to that luncheon. Lyle then used the

-39-

opportunity to take Gloria aside, tell her that he had heard that she was “having problems,” and that he was anxious “to help.”
And that brings us to the fourth element of undue influence: starting with that conversation, Lyle and Aurelie convinced Gloria, through improper means, to sell them the Property for $900,000 less than its market value. Gloria made very clear, in their first substantive conversation the week after Nancy’s birthday luncheon, that she would only sell the Property if she could remain there for the rest of her life. She was aware of the value of the Property, having just had a realtor put it on the market. But price did not matter to her now, as it had not mattered in her proposed transaction with Mr. Stevens, so long as she could stay in the house for life.
The first improper means employed by Lyle and Aurelie was fraud. They promised her that she could stay for life, having no intention of living up to that promise if that should prove inconvenient. And they convinced her to sign a deed and other closing documents that left this life estate entirely unprotected. To do accomplish that purpose, they made other promises that they had no intention of keeping, including that they would prepare a lease, and that their lawyer would represent the interest of all parties concerning the sale of the Property. Lyle and Aurelie knew that Gloria had never been a party to a real estate transaction. Her fiancé had purchased the real estate on which he and Gloria built their home in the late 1950s, and she had lived there without interruption since 1962. Lyle and Aurelie took full advantage of the fact that Gloria would not notice the absence of language creating a life estate in the deed and other documents that they convinced her to sign. See In the Matter of Sharis, 83 Mass. App. Ct. 839, 843 (2013) (finding undue influence in part because, “Significantly, the decedent had no prior wills and there was no evidence that she was familiar with wills or their terminology”).

-40-

Lyle and Aurelie employed another improper means that is common in undue influence cases: they kept the transaction a secret, and use moral persuasion to ensure that Gloria would not mention it to anyone either. As the First Circuit Court of Appeals has said, “Two other factors are also important under Massachusetts case law. One, attempts by the recipient to isolate the donor from her former friends and relatives can be considered in determining undue influence. Two, a court can ‘also consider that she [the donor] acted without independent and disinterested advice....’" In re The Bible Speaks, 869 F.2d 628, 642 (1st Cir. 1989) (citations omitted). Massachusetts appellate courts have more recently reiterated these principles. Sharis, 83 Mass. App. Ct. at 844 (finding evidence of undue influence in the “aura of secrecy surrounding the estate planning, as no one in the family, other than Spinelli, was aware that Alice had executed a will before her death”); In re Estate of Moretti, 69 Mass. App. Ct. 642, 655 (2007) (“Isolating the decedent is an oft-cited tactic of those targeting elderly independent individuals, in order to gain the opportunity to influence favorable bequests”).
From Gloria’s experience with the scammers, Lyle and Aurelie were well aware of her propensity for acting alone when great sums of money were involved. Playing on that susceptibility, they now suggested, at least three times in writing and likely on other occasions in conversation, that neither they nor she should mention the transaction to other family members until it was completed, because of “family dynamics.” It is true that they told Gloria that “this is your call” – while immediately adding “but from our standpoint we are keeping it private.” Exhibit 3c. They guessed correctly that Gloria would honor their wish, as she put it in her testimony. And she did.
Lyle and Aurelie also isolated Gloria from the “independent and disinterested advice” of professionals, as the First Circuit put it. They insisted that Gloria’s realtor have nothing to do

-41-

with the transaction. I conclude that Lyle’s repeated insistence on this point arose partly from his desire to avoid paying a commission, but also because he wished to keep a knowledgeable professional from advising Gloria about the price and other terms of her sale of the Property to him and Aurelie. Worse yet, they also told Gloria that she did not need a lawyer, and their lawyer would represent both sides in the transaction.
Either a disinterested lawyer or a realtor, of course, would have insisted that Lyle and Aurelie put into writing their promise that Gloria could stay at the Property for life. A lawyer most likely would have insisted that the deed reserve a life estate for Gloria. When Gloria herself attempted to protect this right through another means, her proposed lease, Lyle told her that he loved the idea – but that there was no need for a lawyer to write up a lease, as Gloria had suggested, because the parties could draft the lease and save the lawyer’s fee. Then Lyle dropped the idea and never prepared a lease, or even mentioned one again. This was no mere oversight, but rather, as Lyle conceded in his testimony, a deliberate decision. That tactic constituted another improper means.
Finally, Lyle and Aurelie used improper means to exert undue influence in their handling of the closing. Lyle and Aurelie knew that Gloria had no lawyer. They had promised that their lawyer would represent her as well as them. Then they furnished Gloria with no lawyer, nor with any legal advice from their own lawyer. Nor did they show Gloria any documents in advance of the closing. At the closing, faced with the pressure of the lender’s lawyer handing her a series of documents that Lyle and Aurelie were signing, Gloria did not have time to closely review those documents. Nor did she have the inclination, since she was dealing with “family,” as she put it more than once. Her inability to review the documents before she signed them was key to Lyle and Aurelie’s plan, and it worked.

-42-

By improper means, Lyle and Aurelie managed to convince their susceptible, 84-year-old aunt to deed them her Property, for $900,000 less than its value, without obtaining any guarantee that she could stay there even one more day, much less for the rest of her life. I rule that Gloria has established undue influence.
2. Fraud
To prevail on her fraud claim, Gloria must prove that Lyle and Aurelie made "[1] a false representation [2] of a matter of material fact [3] with knowledge of its falsity [4] for the purpose of inducing [action] thereon, and [5] that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage." Balles v. Babcock Power Inc., 476 Mass. 565, 573 (2017), quoting Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982) (further citation omitted). Based on the Findings of Fact above, I rule that Gloria has proved each of these elements of a fraud claim.
The primary false statement, of course, was that Gloria would have the right to live out her life at the Property, even after she sold it to Lyle and Aurelie. When Lyle and Aurelie came to the Vineyard to discuss with Gloria their possible purchase of the house, Gloria made clear that her goal in the transaction (as it had been in the earlier aborted transaction with Mr. Stevens) was to live in the house for the rest of her life. Before the sale was consummated, she said that the transaction would need to include a lease or some other writing guaranteeing her right to stay in the property for her lifetime.
Lyle and Aurelie understood that this provision was the very heart of the transaction from Gloria’s point of view. They also knew that there was only one way to get her to agree to sell them a house then on the market for $1.3 million for the bargain price of $500,000: they had to promise her that she could stay in the property for life. So, when Gloria insisted on this right

-43-

during their very first substantive conversation about a possible deal, Lyle immediately began to dissemble in two ways. First, he promised that Gloria would continue to live in the house for the rest of her life. Second, he assured Gloria her that she did not need to protect this right in writing, because “we’re family.”
Lyle and Aurelie repeated this representation in the email extending the offer to purchase the Property: “you would live there, but we would own the house…”  Exhibit 3b.  As they moved from unconditional oral promises to making promises in writing, Lyle and Aurelie cleverly avoided saying how long “you would live there.” They also attempted to add wiggle room by suggesting, vaguely and for the first and last time, the need for “some conditions related to health matters while you are living there” – significantly, not health matters that would require Gloria to leave the Property – which they said would be “discussed as part of the process.” Id. When they said this in this early email, Lyle and Aurelie had no intention of ever discussing any “conditions related to health matters” with Gloria before purchasing the Property from her. Indeed, they never brought up her health until two years after the closing, when they were already months into their campaign to force Gloria out of the Property, and after they had told Elder Services of Cape Cod and the Islands, accurately, that Gloria was “in relatively good health.” When they later told others about Gloria’s alleged dementia, they were not sincere in their alleged worries about Gloria’s health, raising such concerns only to “escalate the rhetoric” that they hope to might cause public agencies to find housing for Gloria.
Lyle and Aurelie made other false statements, as well. They told Gloria that their lawyer would represent her in the transaction. That did not happen, and Lyle and Aurelie intended that it would happen. Lyle said that they would prepare a lease that would protect her right to stay in the home. That did not happen, because Lyle changed his mind about drafting a lease, and then

-44-

he committed fraud by omission in deciding not to tell Gloria that there would be no lease. Indeed, Lyle committed fraud in his very first statement to Gloria, at her sister’s birthday luncheon on the Cape, when he told Gloria that he was interested in her house because he wanted to “help” her, not because he wanted to obtain a bargain for himself and Aurelie.
Gloria has also proved the other elements of fraud. The statements by Lyle and Aurelie that Gloria could stay at the Property for her lifetime were material to her decision to sell them the house for $500,000. Their later actions, aimed at making Gloria unhappy with her living situation and then ultimately attempting to use legal process to evict her, demonstrate that Lyle and Aurelie knew that the statements were false. Lyle and Aurelie made these statements with the intention that Gloria would rely on them, and she did, to her financial and emotional detriment, by selling her house to Lyle and Aurelie for a fraction of its value and putting herself in a situation where they controlled how, and even where, she would live. In addition, Gloria has proved all of the elements of fraud with regard to statements by Lyle and Aurelie that their lawyer would represent Gloria (and, implicitly, protect her interests) in the transaction, and that her right to stay at the Property would be protected by a lease to be drafted by Lyle.
Lyle and Aurelie argue that Gloria’s reliance on these various representations became unreasonable when she signed closing documents that did not include a lease, and nowhere protected her right to stay at the Property for even one day after the closing. This argument ignores several factors, including actions taken by Lyle and Aurelie to perpetrate their fraud.
First, Lyle and Aurelie support this argument with regular references to the fact that Gloria once held a responsible job involving financial responsibilities. But Gloria had retired from that job two decades earlier, and had since suffered strokes that, according to one expert witness, interfered with her executive function concerning major financial transactions. The

-45-

argument further ignores the fact that the sale of the Property was not an arms-length transaction between independent parties, but rather a sale to trusted family members. Moreover, Lyle and Aurelie conveniently ignore how they played on what they knew to be Gloria’s susceptibility to entering into serious financial transactions without consulting anyone, by isolating her from her realtor, telling her she did not need her own lawyer, and even persuading her not to mention the deal to any of her relatives until after the closing.
Finally, Lyle and Aurelie ignore how they arranged the closing itself so that Gloria would not discover that she was being defrauded. First, they told Gloria that their lawyer would protect her interests. Then they brought her to a closing also attended by a lawyer, whom Gloria had never met but could reasonably assume was the lawyer representing all parties, as promised by Lyle and Aurelie. That lawyer then presented Gloria with documents and asked her to sign them
– documents that Lyle and Aurelie had withheld from Gloria before the closing, and which she did not have time to examine as she signed them.
Whether a person acts “reasonably” depends on the circumstances. In the circumstances presented in this case, I rule that Gloria reasonably relied on the misrepresentations of Lyle and Aurelie.
I rule that Lyle and Aurelie are liable to Gloria for fraud.
3. Intentional Infliction of Emotional Distress
To prevail on a claim for intentional infliction of emotional distress, Gloria would have to establish four elements: “(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was ‘extreme and outrageous,’ was ‘beyond all possible bounds of decency’ and was ‘utterly intolerable in a civilized community’; (3) that the actions of the defendant were the cause

-46-

of the plaintiff’s distress; and (4) that the emotional distress sustained by the plaintiff was ‘severe’ and of a nature ‘that no reasonable man could be expected to endure it.’” Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976) (internal citations omitted).
As to the first element, I rule that, beginning early in 2018, Lyle and Aurelie intended to inflict emotional distress on Gloria, in the hope that this distress would cause her to leave the Property. For example, in an email to his siblings, Lyle made clear that they were acting intentionally, “refreshing” the house specifically to make Gloria feel less comfortable at the Property. Lyle said that he and Aurelie needed to make Gloria “realize that 56 Bay View was no longer ‘her’ house.” Exhibit 8. Lyle then described the actions that he and Aurelie took, quite deliberately, to inflict emotional distress as a tactic to make Gloria reach that realization. Lyle and Aurelie threw away “5 full trucks” of Gloria’s possessions, many of which she treasured, and then held “a busy yard sale” and placed “Bargain Box ads” to dispose of even more of Gloria’s furniture and keepsakes. By cleansing the Property of the objects Gloria had collected in well over a half-century of living there, Lyle stated, he and Aurelie intended to force Gloria to “accept[] the true consequences of her actions, including losing everything she worked so hard over her lifetime.” They were well aware, Lyle said, that this would be a “very painful . . . process . . . for Glo.” And yet they persisted, intentionally.
When “refreshing” the house did not convince Gloria to move out, Lyle and Aurelie took more direct intentional action. They began telling Gloria that she would have to move out. They sent her to the Oak Bluffs Senior Center to fill out an application for elderly housing. In their own efforts to find Gloria another place to live, they began by accurately stating that Gloria was in good health – and when that got them no results, they told a social service agency, in writing,

-47-

that Gloria was suffering from dementia. She was not, and they knew it.  And, I infer, they hoped that word would reach Gloria that they were telling people that she was ill from dementia.
Escalating their intentional actions even further, Lyle and Aurelie then began various legal proceedings against Gloria. First, each of them filed separate Complaints for Protection from Harassment against Gloria herself. Each of them swore in a supporting affidavit that their 86-year-old aunt “is now a threat to our home and our family and she sits right in our living- room.” As a result of the “threat” posed by Gloria, they asked the judge to order Gloria to stay away from the Property – which would have rendered Gloria suddenly homeless. They also asked that the judge order Gloria to pay them “$TBD” in compensation for their alleged loss of the right to use the Property themselves. Lyle and Aurelie were represented by counsel at this point, and so they well knew that these Complaints for Protection and their supporting affidavits would be served on Gloria.
The next intentional act of Lyle and Aurelie was to commence formal eviction proceedings. Not content with serving the prerequisite Notice to Quit by certified mail, they also superfluously had the Sheriff serve it on Gloria in hand. In beginning eviction proceedings against an elderly relative who expected, based on their promises, to remain at the Property for the rest of her life, Lyle and Aurelie were not acting out of concern for her health, as they sometimes said to the outside world. Instead, as they confessed privately (but in writing) to Lyle’s parents and siblings, they took these intentional actions because they had decided that living with Gloria “does not work” for them, and they wanted her out.
Lyle and Aurelie knew that all these actions, and others described in my Findings of Fact, would cause emotional distress to Gloria. In fact, that was their intention.

-48-

The second element of a claim for intentional infliction of emotional distress focuses on the outrageousness of the alleged conduct. When the Supreme Judicial Court first allowed claims “of liability for outrageous conduct causing severe emotional distress, even without manifestation of bodily harm . . . [the Court] warned in Agis . . . that ‘the door to recovery should be opened but narrowly and with due caution.’” Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (internal citation omitted), quoting Agis, 371 Mass. at 144. To slip through that narrowly opened door, a plaintiff must show that the defendant’s conduct was “extreme and outrageous,” “beyond all possible bounds of decency,” and “utterly intolerable in a civilized community,” as Agis put it. 371 Mass. at 145.
I have no trouble finding that Gloria’s proof at trial slips through this narrowly opened door. When the Supreme Judicial Court has held that a plaintiff has stated a claim for intentional infliction of emotional distress, generally the defendant has taken action whose sole purpose is to emotionally distress the plaintiff as a means to an end. For example, in George v. Jordan Marsh Co., 359 Mass. 244 (1971), a bill collector, knowing that the plaintiff was not liable for the debt of her emancipated son, nonetheless telephoned her repeatedly during late evening hours, repeatedly sent her bills indicating that her own account had been “referred to law and collection department,” wrote the plaintiff letters stating that her own credit had been revoked, and engaged in “numerous other dunning tactics,” id. at 245-246 – all aimed at the goal of “intentionally caus[ing] severe emotional distress,” id. at 255, so that the plaintiff would pay her son’s bill.
In Agis, a restaurant manager called together all his waitresses, informed them that “there was some stealing going on,” and that, until the responsible party was discovered, he would be firing them in alphabetical order. He then fired the plaintiff, because her last name began with “A.” 371 Mass. at 141. Once again, the defendant intentionally used emotional distress as a

-49-

weapon, in an attempt to convince the plaintiff or one of her colleagues to reveal the identity of the thief. Id.
This case fits into the same pattern. Here, too, Lyle and Aurelie used emotional distress as a weapon, hoping that if they made Gloria miserable enough, she would leave the Property “voluntarily.” And their tactics were considerably more outrageous, in the circumstances, than the dunning tactics that the Supreme Judicial Court found were utterly intolerable in a civilized community in George.
Third, the actions of Lyle and Aurelie were the cause of Gloria’s distress. It is true that Gloria’s experience with the scammers caused her to suffer emotional distress years earlier.
When she ran out of money, she had to figure out how she was going to stay in her house, and live her life, on Social Security, supplemented by the occasional small loan from her brother David or her nephew Jesse, which was undoubtedly an emotionally distressing state of affairs. But she solved that problem, and ended her distress, when Lyle and Aurelie purchased the Property from her in 2016 and promised her that she could stay there for the rest of her life. For the next two years, as she and Lyle and Aurelie peacefully cohabited, Gloria was quite happy.
Her happiness is obvious in the emails she sent to Lyle and Aurelie when they were away from the Property, and I heard about that happiness in the testimony of all three parties, and Ms.
Cogliano, and Jesse, who said, at least for a while, they were “the perfect trio.”
But then Lyle and Aurelie took actions intending to drive Gloria out of the house, and, when she would not leave voluntarily, they attempted to evict her. The emotional distress suffered by Gloria in 2018 was entirely caused by these wrongful actions of Lyle and Aurelie.
The final element of this tort is that the emotional distress sustained by Gloria “was ‘severe’ and of a nature ‘that no reasonable [person] could be expected to endure it.’” Agis, 371

-50-

Mass. at 144-145. Gloria’s evidence satisfies this requirement. Ms. Cogliano, who had known Gloria for a decade, testified about Gloria’s unhappiness at the yard sale, which occurred relatively early in the campaign by Lyle and Aurelie to make Gloria unhappy in her long-time home. Later, when Ms. Cogliano assisted Gloria in filling out a housing application, Gloria was “despondent.” Later still, just after Lyle and Aurelie served Gloria with a Notice to Quit, Ms. Cogliano encountered Gloria wandering the streets of Oaks Bluffs in the worst condition, emotionally speaking, in which Ms. Cogliano had ever seen her. Jesse gave similar, but less detailed, testimony, also indicating that Gloria was suffering from severe emotional distress about what Lyle and Aurelie were doing to her.
And, in testimony that I have crediedt, Gloria herself testified about her extreme emotional distress. At the time, Gloria told Lyle and Aurelie about how “very sad” and “extremely upset” she felt during the eviction process, because “I was supposed to be able to stay here for my life. This is very hard since we’re family.” Exhibit 3t. In her testimony two years later, she cried when discussing their hard-boiled response: that she should not let her “personal emotions get in the way of reality, which is that you have to vacate our property at 56 Bay View Avenue, Oak Bluffs MA 02557 by October 31, 2018 as per the hand delivered eviction notice (i.e. Notice to Quit).”
Gloria shared her distress with her friends, who, of course, could do nothing to solve her problems with Lyle and Aurelie. She sought medical attention for her emotional upset, but her doctor could only offer her anxiety medication, and she worried about using drugs for this purpose, so she declined the prescription. I rule that Gloria suffered severe emotional distress, that no reasonable person should be expected to endure.

-51-

Gloria’s proof trial satisfied each of the four elements of the tort of intentional infliction of emotional distress. Lyle and Aurelie are liable for that tort.
II. Remedy
The exercise of undue influence by Lyle and Aurelie, and the fraud perpetrated by Lyle and Aurelie, were both aimed at the same goal: convincing Gloria to sell them the Property at a considerable discount while leaving them with the ability to evict her when she was “no longer welcomed at our house,” as Lyle put it in one email. Therefore, to avoid a duplicative recovery, the same remedy should apply as to these two claims.
The usual remedy for the exercise of undue influence is to undo the effect of the ill-gotten document. For example, many undue influence cases involve wills. If the court finds undue influence, the remedy is effected by a court decision not to probate the will, thereby restoring things to the status quo as if the document had never been executed. See, e.g., Moretti, 69 Mass. App. Ct. at 644 (trial judge appropriately dismissed the petition for probate of the 1991 will because it was the product of undue influence, and instead allowed a petition for probate of a 1989 will that was not so tainted).  If undue influence caused a donor to make gifts, the remedy is rescission of those gifts. See, e.g., The Bible Speaks, 869 F.2d at 629, 646 (applying Massachusetts law). Here, by analogy, the appropriate remedy as to the undue influence claim is rescission of the transaction in which Lyle and Aurelie bought the Property from Gloria.
That same remedy can be applied as to the fraud claim, because, in order to undo fraud, a court has the power to grant equitable relief such as rescission of a real estate transaction. See State St. Bank & Trust Co. v. Beale, 353 Mass. 103, 105 (1967) (“It is well-settled that a traditional remedy for a person who has been deprived of land through fraud is specific restitution”); see also Zimmerman v. Kent, 31 Mass. App. Ct. 72, 82 (1991) (where seller of

-52-

waterfront home misrepresented cost and characteristics of required septic system work, “[w]e think the decision of the trial judge to order rescission plus out-of-pocket losses was a sound means of restoring the status quo”).
I rule that the appropriate remedy for the fraud alleged in the Complaint and proved at trial, and for the undue influence alleged in the Complaint and proved at trial, is that the sale of the Property by Gloria to Lyle and Aurelie is RESCINDED.
The remedy for intentional infliction of emotional distress, on the other hand, is money damages. Those damages are intended to compensate Gloria for emotional distress caused by deliberate actions of Lyle and Aurelie that are separate from the 2016 transaction itself. Gloria suffered that emotional distress in 2018, two years after the sale of the Property.
The law provides no special formula to assess Gloria’s emotional distress damages. Instead, like a jury, I must use my judgment and sense of basic justice to translate into dollars and cents an amount that will fairly and reasonably compensate Gloria for the emotional distress deliberately inflicted upon her. For the intentional infliction of emotional distress alleged in the Complaint and proved at trial, I AWARD Plaintiff Gloria Steere compensatory damages of $100,000.00.
Until the necessary papers are passed to rescind the sale of the Property, Lyle and Aurelie remain the owners of record of the Property. For that reason, and undoubtedly out of an overabundance of caution, I make permanent Judge Moriarty’s 2018 preliminary injunction, by ISSUING A PERMANENT INJUNCTION prohibiting Defendants Lyle Steere and Aurelie
Cordier-Steere and their officers, agents, servants, employees, attorneys, successors and assigns, and all persons and entities in active participation or concert with them, from taking any steps toward evicting Plaintiff Gloria Steere from the Property.

-53-

Based on the trial evidence, I infer that Gloria may not possess the $400,000.00 that she will be required to pay to Lyle and Aurelie in connection with the rescission of the sale of the Property (that is, the $500,000.00 they paid her minus the $100,000.00 damages award for intentional infliction of emotional distress). But Gloria will certainly be able to obtain those funds by mortgaging the Property, as soon as it is returned to her ownership. I trust that counsel for all parties will be able to work out the mechanics of such a transaction, if that proves necessary.
So Ordered.

@Paul D. Wilson Justice of the Superior Court

@December 16, 2020

-54-

xxz